UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                                                    Case No. 21-11028-SMG

My FL Management, LLC
                                                                          Chapter 11

     Debtor.
_____/

**DECLARATION OF YURY GNESIN IN SUPPORT OF FIRST DAY MOTIONS**

I, Yury Gnesin, pursuant to Section 1746 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am the authorized representative and Manager of My FL Management, LLC, which is a Florida limited liability company (the "Debtor").

2. I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and books and records. I submit this declaration (the "Declaration") to assist the Court and parties-in-interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of: (a) the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on February 2, 2021 (the "Petition Date"); and (b) the relief that the Debtor has requested from the Court pursuant to the motions and applications described herein (collectively, the "First Day Motions").[1]

3. I further believe that absent (i) engaging bankruptcy counsel; (ii) immediate access to cash collateral, and (iii) authority to make certain essential payments and otherwise continue conducting ordinary course business operations as described herein and in the First Day Motions,

---

[1] The First Day Motions can be found at ECF ## 8, 12, 13, and 18.

the Debtor will suffer immediate and irreparable harm to the detriment of its estate, creditors, and other stakeholders.

4. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with the members of the Debtor's management, information provided to me by the team working under my supervision or the Debtor's professional advisors, Edelboim Lieberman Revah Oshinsky PLLC ("ELRO") as legal restructuring counsel, or my opinion based upon my experience and knowledge. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

## I. Background.

5. The Debtor is a Florida limited liability company with its principal place of business in 3711 N. Ocean Boulevard, Fort Lauderdale, FL 33308, Broward County, Florida.

6. The Debtor is in the business of owning and managing certain Fort Lauderdale, Florida hotel properties commonly known as Royal Beach Palace Hotel (and the restaurant located therein), and the Galt Villas. The properties are made up of 6 contiguous parcels of real property (of which, the Debtor owns the main building and manages the other 5 buildings).

7. As with all hospitality related businesses, the Debtor has also been significantly affected by the Covid-19 pandemic. While the future looks bright, the year 2020 was challenging and the Debtor requires an organized process to restructure its financial affairs.

8. The Debtor is a party to a certain lawsuit in the Circuit Court of the 17th Judicial Circuit in and for Broward County (Case No. CACE-20-010533) stemming from, among other things, a contract dispute with its largest creditor (the "State Court Lawsuit"). In the State Court Lawsuit, among other things, the Debtor filed a complaint against A&D Mortgage LLC ("A&D")

for breach of contract and A&D counterclaimed to foreclose on its secured debt.

9. The Debtor believes that the Chapter 11 process is an appropriate mechanism to resolve outstanding cash flow issues and outstanding claims in one efficient forum and manage its affairs through a transparent process that should result in a reorganization of the Debtor's finances so it can continue its operations for the benefit of all constituencies.

10. The Debtor believes that a swift resolution of this bankruptcy proceeding will benefit the Debtor and its creditors.

## II.     Relief Sought in First Day Papers.

11. The Debtor has filed several First Day Motions seeking relief that is necessary to enable the Debtor to smoothly transition into this chapter 11 case and minimize disruptions to its business operations. I respectfully submit that the relief requested in each First Day Motion should be granted, because such relief is a critical element in stabilizing and facilitating the Debtor's operations during the pendency of this chapter 11 case.

12. A summary of the relief requested in each First Day Motion is set forth below. I have reviewed each of the First Day Motions and confirm that all of the facts set forth therein are true and correct to the best of my knowledge and belief, based upon my personal knowledge of the Debtor's business, employees, operations, and finances; information learned from my review of relevant documents; my discussions with members of the Debtor's management and advisors; information provided to me by employees working under my supervision; or my opinion based on experience, knowledge, and information concerning the Debtor's businesses.

### A.     Emergency Motion to Employ Brett Lieberman, Esq. and ELRO.

13. On February 6, 2021, Debtor filed its *Emergency Application Of Debtor-In-Possession For Entry Of An Interim Order Granting/Authorizing The Employment And Retention*

*Of Brett Lieberman And The Law Firm Of Edelboim Lieberman Revah Oshinsky PLLC As Counsel For Debtor-In-Possession Nunc Pro Tunc To February 2, 2021 And Entry Of A Final Order On Or After February 23, 2021* (the "Emergency Motion to Employ ELRO") [ECF No. 9]. Through the Emergency Motion to Employ ELRO the Debtor seeks the immediate entry of an interim order and final order authorizing the Debtor to employ and retain Brett Lieberman, Esq. and the law firm of ELRO as its bankruptcy counsel with regard to the filing of its Chapter 11 petition and the prosecution of its Chapter 11 case.

14. Continued representation of the Debtor by its bankruptcy counsel, Brett Lieberman and the law firm of ELRO, is critical to the success of the Debtor's effective and efficient reorganization and because Edelboim and ELRO are familiar with the Debtor's financial and legal affairs, it is in the best interests of the estate.

15. The Debtor has selected the firm of ELRO as attorneys because of the firm's experience with and knowledge of the Debtor and its financial and legal affairs, as well as its extensive experience with and knowledge in the field of debtors' and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code.

16. The Debtor desires to employ the firm of ELRO under a general retainer because of the extensive legal services that will be required in connection with its Chapter 11 case and the firm's familiarity with the business of the Debtor.

17. The services of Lieberman and ELRO are necessary to enable the Debtor to execute faithfully its duties as debtors-in-possession. Subject to order of this Court, ELRO will be permitted to render, among others, the following services to the Debtor:

> (a) advise the Debtor with respect to its powers and duties as debtor and debtor-in-possession in the continued management and operation of its business and properties;

(b) attend meetings and negotiate with representatives of creditors and other parties-in-interest and advise and consult on the conduct of the cases, including all of the legal and administrative requirements of operating in Chapter 11;

(c) advise the Debtor in connection with post-petition financing arrangements and draft documents relating thereto;

(d) take all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions on its behalf, the defense of any actions commenced against the estate, negotiations concerning all litigation in which the Debtor may be involved and objections to claims filed against the estate;

(e) prepare on behalf of the Debtor all motions, applications, answers, orders, reports and papers necessary to the administration of the estate;

(f) negotiate and prepare on the Debtor's behalf a plan of reorganization, disclosure statement and all related agreements and/or documents, and take any necessary action on behalf of the Debtor to obtain confirmation of such plan;

(g) attend meetings with third parties and participate in negotiations with respect to the above matters;

(h) appear before this Court, any appellate courts, and the U.S. Trustee, and protect the interests of the Debtor's estate before such courts and the U.S. Trustee; and

(i) perform all other necessary legal services and provide all other necessary legal advice to the Debtor in connection with this Chapter 11 case.

18. The firm of ELRO is willing to act on behalf of the Debtor as set forth above.

19. Without counsel, the Debtor cannot effectively proceed with its case and its efforts in seeking bankruptcy protection will be materially harmed.

20. Debtor's bankruptcy counsel, ELRO will play an integral role throughout the case, during which the first 21 days of this chapter 11 case is a particularly critical period.

B. **Emergency Motion For Authorization To Use Cash Collateral.**

21. On February 8, 2021, the Debtor filed its *Debtor's Emergency Motion for*

*Authorization to Use Cash Collateral* (the "Emergency Cash Collateral Use Motion") [ECF #12]. Through the Emergency Cash Collateral Use Motion, the Debtor seeks the entry of an Order authorizing the Debtor to use Cash Collateral on an interim basis, as that term is defined in 11 U.S.C. § 363(a). The Debtor proposes to use the Cash Collateral in the ordinary course of business and pursuant to its budget, attached to the Emergency Cash Collateral Use Motion as Exhibit "A". Upon information and belief, the Debtor expects to file an amended budget that, among other things, increases payments to A&D and more accurately projects future income. The Debtor also intends to pay its proposed counsel, ELRO, to the extent permitted and requeierd, using the Cash Collateral.

22. The Debtor is aware of the following creditor that may claim to have a secured interest in the Cash Collateral, namely A&D Mortgage, LLC (the "A&D").

23. To the extent that A&D is secured by Debtor's Cash Collateral, the significant equity cushion in the real property constituting its collateral adequately protects A&D.

24. A&D's secured claim is in the approximate amount of $10,469,232 plus interest (calculated at the default rate) of $1,781,233.50, totaling approximately $12,250,465.00[2] and the real property securing such claim exceeds $23,000,000.00.

25. Debtor also proposes to pay A&D a specified amount on a monthly basis in order to offer additional forms of adequate protection.

26. Accordingly, the Debtor offers, as adequate protection, (i) monthly payments and (ii) significant equity cushion to protect A&D's secured interests.

27. The Debtor is the owner and manager of hotel and restaurant properties. While the Covid-19 pandemic has ravaged the hospitality industry, the Debtor's operations are climbing

---

[2] Debtor disputes that pre-petition interest should be calculated at the default rate and reserves all rights to object to same.

towards normalcy and it is anticipated that occupancy rates will climb in the near future.

28.     The continued operation of the Debtor's business will preserve its going concern value and enable the Debtor to maintain its hotel and restaurant operations.

29.     The Debtor's use of the Cash Collateral includes, but is not limited to, the use of the Debtor's cash to pay for the ordinary operating expenses of the Debtor to maintain the hotel establishment and render services to its patrons and the costs associated with this Chapter 11 case, including managing the Royal Beach Palace Properties and Galt Villas.

30.     If the Debtor is unable to operate and provide these services, it will have an adverse effect on its business and its patrons, and it will greatly reduce the likelihood of a successfully reorganization that sees all creditors paid in full.

31.     If the Debtor cannot use the Cash Collateral, it will be unable to continue its business operations and provide necessary to its hotel guests. Use of Cash Collateral will allow the Debtor to maintain operations and preserve the going concern value of its business, which will inure to the benefit of the A&D and all other creditors.

32.     The Debtor believes that use of Cash Collateral pursuant to its (amended budget) is fair and reasonable and adequately protects A&D.

33.     The combination of (i) Debtor's ability to preserve the going concern value of the business with the use of Cash Collateral; and (ii) providing A&D Mortgage with payments and equity cushion will adequately protect A&D's alleged secured positions.

    **C.**     **Motion to Pay (I) Critical Vendors and (II) Wages, Benefits, and Taxes**

34.     On February 8, 2021, the Debtor filed its *Debtor's Emergency Motion for Authorization to Pay Prepetition (I) Obligations to Critical Vendors and (II) Wages, Benefits, Payroll, Taxes and Related Administrative Obligations* (the "Critical Vendor Motion") [ECF No.

14]. Through the Critical Vendor Motio, the Debtor seeks entry of an Order authorizing the Debtor to pay the prepetition claims of certain vendors that are critical to the operation of the Debtor's business, to pay pre-petition wages, payroll taxes, benefits, and related administrative obligations.

35. To carry out its operations, the Debtor relies on several different types of service providers and suppliers to conduct its business operations and to meet the payroll and operation needs for the hotel and restaurant therein.

36. The service providers and suppliers that debtor employs are critical to the continuation of Debtor's business operations.

37. The Critical Vendors (as defined in the Critical Vendor Motion) typically supply their customers with services (*e.g.,* staffing employees) and trade terms based on their experience with and perceived risk of conducting business with such customers.

38. The Debtor believes that it would be exceedingly difficult, if not impossible, to replace the Critical Vendors within a reasonable time without severe disruption to the Debtor's business. Such harm would likely far outweigh the cost of payment to the Critical Vendor Claims.

39. Given the importance of the services provided by the Critical Vendors, it is imperative that the Debtor be granted the flexibility and authority to satisfy the prepetition Critical Vendor Claims ("Critical Vendor Claims"). The Debtor believes that payment to the Critical Vendor Claims is fair and reasonable for the goods and services provided.

40. Payment of the Critical Vendor Claims is necessary for the Debtor to maintain operations and consequently preserve the value of its business. The Critical Vendors will not provide goods and services without payment of the Critical Vendor Claims, and therefore a sound business justification exists for the relief requested. Moreover, maintaining favorable trade terms and credit is in the best interest of the estate, all creditors and other parties in interest.

41. Additionally, there will be no prejudice to other creditors resulting from the Court's authorization of the requested payments to the Critical Vendors. Such payments are absolutely essential to the Debtor's continued business operations and revenue generation, which benefits all creditors.

42. Failure to pay the Critical Vendor Claims, including the Staffing Companies (as defined in the Critical Vendor Motion) would bring the Debtor's business to a standstill, which would cause immediate and irreparable harm to the Debtor, its business and the estate.

### D.  **Debtor's Motion to Continue Use of Pre-Petition Bank Accounts**.

43. On February 9, 2021, the Debtor filed its *Debtor's Emergency Motion to Continue (i) Use of the Debtor's Cash Management System and Pre-Petition Bank Accounts and a Limited Waiver of U.S. Trustee Guidelines; or (ii) to Appoint Agent to Open DIP Accounts* (the "Bank Account Motion"). Through the Bank Account Motion, the Debtor seeks entry of an order either to continue using its pre-petition accounts consistent with it prepetition systems (the "Cash Management System") or authorizing Ronnie Dobrushin, (my son and the Debtor's day-to-day manger), to open DIP accounts for the Debtor and directing Wells Fargo Bank (the "Bank") to permit same.

44. I am currently in Ukraine. With the Covid-19 pandemic, I am unable to timely return to the United States to open a DIP account for the Debtor in-person.

45. Wells Fargo has advised that DIP accounts can only be opened by me in-person or at the direction of a Court order.

46. Through the Bank Account Motion, the Debtor seeks authority either to continue to use the Debtor's pre-petition bank accounts (which Debtor believes would maximize efficiencies, eliminate operational disruption and inure to the benefit of all constituencies), or to

authorize Mr. Dobrushin to open DIP accounts for the Debtor.

47. On or about February 5, 2021, Dobrushin attempted to open debtor-in-possession accounts ("DIP Accounts") for the benefit of the Debtor in this matter. It was explained to Dobrushin by the Bank that DIP Accounts could only be opened by Mr. Gnesin, in-person, or at the direction of an order from this Court.

48. In order to maintain the efficient operation during the chapter 11 case, the Debtor must either be able to use its Cash Management System or, at a minimum, be allowed to open DIP accounts through Dobrushin.

49. For the foregoing reasons, the Debtor's seeks emergency relief under the Bank Account Motion.

50. I support all of the foregoing First Day Motions and respectfully request that the Court enter orders granting same.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 9, 2021

By: */s/ Yury Gnesin*
Yury Gnesin as authorized
representative of the Debtor