**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Ft. Lauderdale Division**

In re:

                                  Case No. 21-11028-SMG

My FL Management, LLC,                Chapter 11

      Debtor.

_____/

**OBJECTION TO CLAIM OF A&D Mortgage, LLC**
**PURSUANT TO 11 U.S.C § 502 AND FOR RELATED RELIEF**

Debtor and Debtor-in-Possession, My FL Management, LLC (the "**Debtor**"), by and through undersigned counsel, hereby files this *Objection to Claim Pursuant to 11 U.S.C. § 502 and for Related Relief* (the "**Objection**") against A&D Mortgage, LLC ("**A&D**"). In support of this Objection, Debtor states as follows:

**BRIEF SUMMARY OF OBJECTION**

During the height of Covid-19 pandemic restrictions, A&D manufactured a payment default and charged hundreds-of-thousands-of-dollars of default interest without providing the Debtor notice or an opportunity to cure.

A&D's actions not only violated the agreements between the parties, A&D also violated laws designed to protect consumers from unscrupulous creditor action.

A&D ought not be allowed to profit from its bad acts. A&D's claim must be disallowed to the extent it seeks default interest, penalties, fees and costs related to the alleged defaults.

**THE PARTIES, JURISDICTION, AND VENUE**

1.      Debtor, My FL Management, LLC is a Florida limited liability company, having a principal place of business at 3711 N. Ocean Boulevard, Fort Lauderdale, FL 33308.

2.      A&D is a limited liability company organized under the laws of the State of Florida

and doing business in Broward County, Florida.

3.       This Court has jurisdiction over this Objection pursuant to 28 U.S.C. §§ 151, 157 and 1334(b). Venue is proper pursuant to 28 U.S.C. § 1409.

4.       The Debtor's Objection to A&D's proof of claim is a contested matter under Rule 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 9014-1.

## GENERAL ALLEGATIONS

5.       On February 2, 2021, (the "**Petition Date**"), Debtor filed a voluntary petition in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Since that time, Debtor has operated as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.       On March 31, 2021, A&D filed its Proof of Claim No. 6 (the "**Claim**") in the above-captioned bankruptcy proceeding.

7.       The Debtor operates and manages the Royal Beach Palace Hotel and the restaurant located therein, and the Galt Villas. These hotel properties are constituted of, among other things 6 contiguous parcels of real property owned by the Debtor and certain affiliated entities located at:

- 3711 N. Ocean Blvd., Fort Lauderdale, FL 33301 (owned and managed by Debtor).
- 3801 N. Ocean Blvd., Fort Lauderdale, FL 33308 (owned by affiliate Rentals Vacation Property LLC and managed by the Debtor).
- 3811 N. Ocean Blvd., Fort Lauderdale, FL 33308 (owned by affiliate MY FL 3811 LLC and managed by the Debtor)
- 3821 N. Ocean Blvd., Fort Lauderdale, FL 33308 (owned by affiliate MY FL 3821 LLC and managed by the Debtor) (together, the "**Royal Beach Palace Properties**").
- 3621 N. Ocean Blvd., Fort Lauderdale, FL 33308 (owned by affiliate MY FL 3621 LLC and managed by the Debtor).
- 3623 N. Ocean Blvd., Fort Lauderdale, FL 33308 (owned by affiliate MY FL 3623 LLC and managed by the Debtor) (together, the "Galt Villas").

8.       A&D is a mortgage lender and servicer offering conventional and non-qualifying

mortgage products.

9.      Debtor and certain of its affiliates, MY FL 3821 LLC, My FL 3811 LLC, and Rentals Vacation Property, LLC are the borrowers (collectively the "**Borrowers**") under a promissory note dated September 5, 2017, in the principal amount of $11,000,000 (the "**Promissory Note**"). A true and correct copy of the Promissory Note is attached hereto as **Exhibit A**.

10.     A&D is the servicer for Imperial Fund I, LLC, who appears to be the holder of the Promissory Note and a mortgage (the "**Mortgage**") dated September 5, 2017, which is secured by the Royal Beach Palace Properties. A true and correct copy of the Mortgage is attached hereto as **Exhibit B**.

11.     The maturity date of the Promissory Note and Mortgage is September 1, 2027 (collectively referred herein as the "**Loan Agreement**").

12.     The Promissory Note bears an interest rate of 5.75%.

13.     Under the schedule of monthly payments of the principal and corresponding interest rate of 5.75%, the first monthly payment under the Promissory Note came due on October 1, 2017 in the amount of $68,201.70, and every month thereafter, regular monthly payments in the amount of $69,201.70 each came due.

14.     Paragraph 12.4 on page 4 of the Promissory Note, is entitled <u>No Amendment or Waiver Except in Writing</u>.

15.     Paragraph 12.4 on page 4 of the Promissory Note provides that the Promissory Note may be amended or modified only by a writing duly executed by Debtor and A&D.

16.     In connection with and as part of the closing of the Loan Agreement, the Debtor executed a written Automated Clearing House form (the **"ACH Authorization"**).

17.    The most recent version of the ACH Authorization was executed on November 21, 2019. A true and correct copy of the ACH Authorization is attached hereto as **Exhibit C**.

18.    Each of the monthly payments required under the Loan Agreement was withdrawn by A&D via electronic ACH payment pursuant to the ACH Authorization.

19.    The ACH Authorization authorizes A&D to automatically withdraw from Debtor's account sufficient sums to pay monthly payments under the Loan Agreement.

20.    The ACH Authorization is on A&D letterhead and was provided to the Debtor by A&D.

21.    The ACH Authorization states, among other things, "Please specify the payment date most convenient for you, which must be within the applicable grace period. If a payment date is not specified, or your loan is a daily simple interest loan, payments **will be** deducted on your current loan due date."

22.    The ACH Authorization further provides that the payments should be deducted on the "1st day of each month".

23.    A&D did not terminate the ACH Authorization at any time prior to March 2020.

24.    A&D did not obtain Debtor's written or verbal consent to stop the automatic ACH withdrawals that A&D had been routinely doing on the first day of each month pursuant to the ACH Authorization.

25.    A&D failed to inform the Debtor that it had removed the ACH Authorization linked to Debtor's bank account.

26.    Without cause, direction or notice, A&D unilaterally stopped its ACH withdrawals required under the ACH Authorization on or about March 1, 2020.

27.    A&D did not withdraw funds under the ACH Authorization for the month of March

2020 or thereafter.

28.     A&D did not provide notice to the Debtor that it was not going to withdraw funds pursuant to the ACH Authorization as had been its ordinary course of conduct.

29.     At all relevant times, Debtor held sufficient sums in its bank account to make the required monthly payment.

30.     Had A&D continued to electronically and automatically draw via ACH as it had done previously, no payment would have been missed.

31.     A&D was required to provide the Debtor notice and an opportunity to cure defaults prior to acceleration and accrual of default interest.

32.     Paragraph 2.02 of the Mortgage provides the following:

> If a Default shall have occurred and be continuing, the Lender may upon providing Borrower with **ten (10) day written notice to cure default**, declare the entire principal amount of the Note then unpaid and the interest accrued thereon to be due and payable immediately, and upon such declaration such principal and interest shall forthwith become and be due and payable, together with any prepayment fees that may be due and payable in full as fully and completely as if the said aggregate sum of said indebtedness was originally stipulated to be paid in full on such date, **anything in the Note or this Mortgage to the contrary notwithstanding**.

(emphasis added).

33.     The term "Default" as defined in Section 2.01 of the Mortgage, includes the following phrase "that is not cured within any applicable cure or grace period" (with respect to payment failures; Mortgage, 2.01(a)), and "that is not cured within any applicable cure or grace period as set forth in the Loan Agreement or other applicable document" (with respect to covenants, conditions or other agreements; Mortgage, 2.01(b)).

34.     In the State Court Lawsuit (hereinafter defined), A&D claimed to have satisfied its obligation to provide written notice and an opportunity to cure through a certain letter dated May

13, 2020 (the "**Demand Letter**").[1] A true and correct copy of the Demand Letter is attached hereto

as **Exhibit D**.

35.    On May 13, 2020,  A&D sent the Demand Letter to certain of the guarantors (not

the Debtor).

36.    Paragraph 3.02 of the Mortgage provides the following:

(a) Borrower. Any notice, demand or other instrument authorized by this Mortgage
to be served on or given to the borrower may be served on or given to the Borrower,
at: THE BORROWER'S ADDRESS AS INDICATED ON PAGE ONE HEREOF
or at such other address as may have been furnished in writing to the Lender by the
Borrower.
. . .

(c) Delivery of Notice. All notices shall be in writing and shall be delivered by
certified mail, return receipt requested or be delivered via overnight mail service.
All notices shall be deemed made when delivery is first attempted at the address or
addresses required hereunder.

37.    The Demand Letter was not addressed to the Debtor.

38.    The Demand Letter was not delivered to the Debtor.

39.    The Demand Letter did not provide the Debtor an opportunity to cure any claimed

defaults.

40.    The Demand Letter does not satisfy the notice and opportunity to cure conditions

of the Mortgage.

41.    The Demand Letter claimed, among other things, that (i) a default under the Loan

Agreement and Mortgage had already occurred, (ii) default interest had already been assessed, and

(iii) the loan had already been accelerated.

42.    The Demand Letter required, among other things, immediate payment of

$437,718.00 in default interest at the default rate of 25% and unpaid fees to "reinstate" the

---

[1] See paragraph 20 of the *Defendant, A&D Mortgage LLC's Answer and Affirmative Defenses, Renewed Motion to
Strike Jury Trial Demand, and Counterclaim*, filed on December 10, 2020 in the State Court Lawsuit (hereinafter
defined).

Promissory Note and Mortgage.

23.    The Demand Letter required approximately **$300,000.00 more** than what would have been a cure amount.

24.    A&D failed to comply with, among others, paragraphs 2.02 and 3.02 of the Mortgage.

25.    By, among other things, (i) failing to timely withdraw funds pursuant to ACH Authorization; (ii) failing to provide adequate notice; (iii) failing to provide an opportunity to cure; (iv) demanding an exorbitant "reinstatement" fee; and (iv) failing to comply with material provisions of the Mortgage, A&D breached the Loan Agreement, its duty of good faith and fair dealing and violated FDUPTA (defined herein).

26.    On June 30, 2020, Debtor and certain affiliates and insiders brought suit against A&D in the circuit court of Broward County, Florida, for (i) breach of contract; (ii) violation of Florida's deceptive and unfair trade practices act; (iii) fraud by omission; (iv) negligent misrepresentation; (vi) breach of good faith and fair dealing; and (vii) declaratory relief. The case caption is *My FL 3821, LLC et. al. v. A&D Mortgage, LLC*, Case No. CACE-20-010533 (the "**State Court Lawsuit**").

27.    On November 20, 2020, the state court entered an order denying A&D's motion to dismiss the State Court Lawsuit.

28.    On December 10, 2020, A&D filed its answer and affirmative defenses, and counter-claimed, among other causes of action, for (i) foreclosure of the Mortgage secured by the Royal Beach Palace Properties; and (ii) for breach of the Promissory Note.

29.    Debtor — facing the effects on the hospitality industry prompted by Covid-19 and A&D's alleged claims to foreclose on the Royal Beach Palace Properties — filed its voluntary

petition for relief under Chapter 11 of the Bankruptcy Code on February 2, 2021, seeking to reorganize its financial affairs including a resolution of the underlying dispute with A&D.

## OBJECTION TO CLAIM
### (11 U.S.C. § 502)

30.     Debtor incorporates and re-alleges the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

31.     On March 31, 2021, A&D Mortgage, LLC filed the Claim in the total amount of $12,705,334.24, secured by the Mortgage on Debtor's Royal Beach Palace Properties.

32.     A&D seeks to (i) accelerate and enforce the outstanding principal amount of the Promissory Note in the amount of $10,469,232.14; (ii) collect interest payments on the Promissory Note calculated at the default rate of 25% for a total amount of $2,231,982.10 for the monthly periods of April 1, 2020 to February 1, 2021 ("**Default Interest**"); and (iii) to recover attorney's fees and costs for the State Court Lawsuit in the amount of $4,120.00.

33.     Section 502(b)(1) of the Bankruptcy Code provides that a proof of claim shall be disallowed if "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

34.     The Default Interest and attorney fees of the Claim are not allowed under the subject agreements and applicable law.

35.     Accordingly, the Default Interest and attorney fee components of the Claim ought to be disallowed.

    A.     **Failure of Condition Precedent – No Notice**

        **a. No Notice of Default/Acceleration or Opportunity to Cure**

36.     Debtor objects to A&D's Claim amount because A&D failed to provide requisite notice of the alleged default or opportunity to cure same.

37.     The Mortgage requires A&D to provide Debtor 10 day's written notice and an opportunity to cure claimed defaults.

38.     A&D failed to provide sufficient notice to the Debtor of any alleged Default.

39.     A&D failed to provide Debtor an opportunity to cure any alleged default.

40.     Accordingly, A&D's Claim for Default Interest and attorney's fees is unenforceable against the debtor and property of the debtor under the subject agreements and applicable law.

41.     A&D's Claim should not be allowed to the extent it seeks Default Interest and attorney's fees for attempting to collect same.

**b.  No Notice of A&D's Unilateral Cancellation of the ACH Authorization**

42.     Debtor objects to A&D's Claim amount because A&D was responsible for the alleged default of the Loan Agreement.

43.     Entry into the ACH Authorization constituted a modification of the Loan Agreement by written instrument.

44.     The ACH Authorization modified the payment obligations under the Loan Agreement by authorizing and requiring A&D to deduct sufficient sums on a monthly basis to pay all obligations owed by the Debtor on account of the Loan Documents.

45.     A&D's failure to comply with the ACH Authorization which provides, in relevant part, that payments "**will be**" timely and automatically deducted by A&D constitutes a breach of the agreement.

46.     A&D's unilateral cancellation of the ACH Authorization <u>without notice</u> to the Debtor constitutes an impermissible modification of the Loan Documents.

47.     By failing to withdraw funds as required under the ACH Authorization, A&D induced Debtor's Default.

48.     Such conduct constitutes, among other things, a breach of the terms and provisions of the Loan Agreement.

49.     Because A&D failed to provide notice to the Debtor that it would not honor the ACH Authorization, A&D would be precluded from accelerating the Promissory Note and charging the Default Interest and related attorney's fees under the subject agreements and applicable law.

50.     Accordingly, A&D's Claim for Default Interest and attorney's fees is unenforceable against the debtor and property of the debtor under the subject agreements and applicable law.

51.     A&D's Claim should not be allowed to the extent it seeks Default Interest and attorney's fees for attempting to collect same.

**B.      <u>Set-off and Recoupment</u>**

47.     Debtor objects to A&D's Claim because Debtor has claims against A&D that setoff and/or recoup amounts claimed by A&D.  Debtor's setoff and recoupment claims sound in breach of contract, breach of covenants of good faith and fair dealing, violation of Florida Unfair and Deceptive Trade Practices Act, and in equity (unclean hands).

**a.      <u>Breach of Contract and Covenants of Good Faith and Fair Dealing</u>**

48.     A&D failed to comply with the Promissory Note and ACH Authorization.

49.     The ACH Authorization imposed an affirmative obligation upon A&D to timely withdraw sufficient funds from Debtor's account to satisfy all payments required by the Loan Agreement.

50.     A&D failed to timely withdraw sufficient funds from Debtor's account to satisfy all payments required by the Loan Agreement.

51.     On account of A&D's failure, the Debtor was harmed and suffered damages in the form of, among other damages, default interest and A&D's attorney's fees and Debtor's own attorney's fees.

52.     A&D's failure constitutes a first (or prior) breach of the terms of the Loan Agreement and ACH Authorization.

53.     Importantly, A&D also failed to comply with paragraphs 2.02 and 3.02 of the Mortgage because it failed to provide Debtor with 10-day written notice of the alleged default and an opportunity to cure same.

54.     Instead, the Demand Letter required immediate payment of $437,718.00 in Default Interest at the maximum rate of 25% and unpaid fees to "reinstate" the Promissory Note and Mortgage.

55.     Due to A&D's failure to honor and faithfully perform under the terms of the Loan Agreement, including the ACH Authorization, A&D committed a material breach of same.

56.     At all material times, Debtor was ready, willing, able, and had sufficient sums in its bank account to satisfy the Loan Agreement's monthly installment payments.

57.     Moreover, Florida law recognizes an implied covenant of good faith and fair dealing in every contract.

58.     This covenant is intended to protect the reasonable expectations of the contracting parties in light of their express written agreement(s).

59.     Debtor executed the ACH Authorization for the purpose of allowing A&D to automatically withdraw the monthly installment payments from Debtor's bank account.

60.     Debtor never authorized or directed A&D to cease making its automatic withdrawals of the monthly installment payments from Debtor's bank account.

61.     When A&D unilaterally elected to stop withdrawing its automatic ACH payments, the alleged defaults occurred.

62.     A&D's bad act created the alleged default.

63.     Having created the alleged non-payment default on or around March 1, 2020, A&D did not provide notice of any kind until May of 2020.

64.     At which time, A&D demanded nearly $300,000.00 in default interest to reinstate the Promissory Note.

65.     A&D did this at a time when the Debtor was facing unprecedented challenges presented by the Covid-19 Pandemic.

66.     A&D acted in bad faith and with unclean hands.

67.     In doing so, A&D breached the covenant of good faith and fair dealing and acted without clean hands.

68.     For these reasons, A&D's Claim should be disallowed and reduced/setoff/recouped to the extent of the damages the suffered by the Debtor on account of A&D's actions.

b. **Violation of Florida Deceptive and Unfair Trade Practices Act**

69.     Debtor objects to A&D's Claim because of A&D's actions constitute violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA").

65.     FDUPTA, Section 501.201, et seq., Florida Statutes, prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204.

66.     Debtor is a "consumer" as that term is defined in section 501.203(7) of FDUPTA.

67.     A&D engaged in and continues to engage in unconscionable acts or practices and engaged in unfair or deceptive acts in the conduct of its trade and/or commerce by unilaterally stopping its automatic ACH withdrawals from Debtor's account, without any written or verbal direction from Debtor, thereby unfairly and deceptively inducing alleged defaults that would not have otherwise occurred.

68.     A&D exacerbated its unconscionable acts by failing to provide Debtor an opportunity to cure the claimed defaults.

69.     Finally, A&D's acts are particularly heinous in the context that the Debtor is a hotel owner and operator and A&D's actions took place during the height of government imposed Covid-19 restrictions (and at a time when most lenders were offering forbearance to similarly situated borrowers).

70.     The policies, acts and practices by A&D, as set forth herein, were intended to result and did result in creating alleged defaults of Debtor's Loan Agreement.

71.     A&D's actions directly led it to assert a claimed default, claim the Default Interest, acceleration and attorney's fees to the detriment of the Debtor.

72.     At all times material hereto, A&D knew our should have known that (i) while Debtor's cash flows were challenged on account of the Covid-19 restrictions; (ii) that A&D's claim was over-secured and acceleration and accrual of default interest was particularly harmful to the Debtor on account of the pandemic.

73. A&D unfairly stopped its automatic ACH withdrawals from Debtor's bank account, which was the only source used by Debtor to make the monthly Loan Agreement payments.

74. A&D stopped its withdrawals without written or verbal notice to Debtor and/or written or verbal consent from Debtor to do so. A&D's conduct violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed with approval from A&D's owners and/or authorized agents in an attempt to unlawfully extort additional monies from Debtor.

75. A&D's conduct of inducing Default and then deceitfully, unfairly and deceptively choosing not to provide Debtor with written notice or an opportunity to cure the alleged default within a reasonable period of time also violates FDUTPA and was conceived, devised, planned, implemented, approved, and executed by A&D and its owners and/or authorized agents.

76. Debtor has sustained damages as a direct and proximate result of A&D's unfair and unconscionable practices.

77. Debtor has suffered and will continue to suffer irreparable harm if A&D continues to engage in such deceptive, unfair, and unreasonable practices.

78. As a result, Debtor suffered damages, which damages should be setoff and/or recouped thereby reducing A&D's claim amount.

79. For these reasons, A&D's Claim should be disallowed and reduced/setoff/recouped to the extent of the damages the suffered by the Debtor on account of A&D's actions.

80. Debtor also seeks an award of attorney's fees and costs in connection with this Objection and all claims herein in the form of a further reduction and disallowance of A&D's

Claim.

Respectfully submitted on April 15, 2021.

> **EDELBOIM LIEBERMAN**
> **REVAH OSHINSKY PLLC**
> *Counsel for the Debtor*
> 20200 W. Dixie Highway, Suite 905
> Miami, FL 33180
> Telephone: (305) 768-9909
> Facsimile: (305) 928-1114
> Email: brett@elrolaw.com
>
> By:*/s/ Brett Lieberman*
> Brett D. Lieberman (FBN 69583)

# Exhibit "A"

# PROMISSORY NOTE

$11,000,000.00                                                                                        SEPTEMBER 5, 2017

FOR VALUE RECEIVED, the undersigned ("Borrower") promises to pay to **A&D MORTGAGE LLC, a Florida limited liability company,** ("Lender"), or order, at 1040 South Federal Highway, Hollywood, Florida, 33020, or at such other place as Lender, may from time to time designate by written notice to Borrower, the sum of **ELEVEN MILLION  and 00/100 Dollars ($11,000,000.00)** together with interest on the balance of unpaid principal from the date hereof at the per annum rate set forth below, computed on the basis of a full calendar year consisting of twelve equal calendar months.

DEFINITIONS.  The following terms shall have the following meanings:

A.    Additional Interest.  The additional interest due and calculated at the Past Due Rate on the occurrence of any of the events specified in Section 7.

B.    Borrower. MY FL 3821, LLC, a Florida limited liability company; MY FL 3811, LLC, a Florida limited liability company; RENTALS VACATION PROPERTY, LLC, a Florida limited liability company; and MY FL MANAGEMENT, LLC, a Florida limited liability company.

C.    Mortgage.  The Mortgage and Security Agreement of even date herewith encumbering the Property.

D.    Maturity Date.  **SEPTEMBER 1, 2027.** The entire balance of principal and accrued interest and other amounts then outstanding on this Note are due and payable on the Maturity Date.

E.    Past Due Charges.  Ten Cents ($.10) for each One Dollar ($1.00) of the amount of each delinquent payment not received by the holder within TEN (10) days after it is due.  The late charge is not a penalty, but liquidated damages to defray administrative and related expenses due to such late payment.  The late charge shall be immediately due and payable and shall be paid by the maker to the holder without notice or demand; provided, however, under no circumstances shall any such late charges be imposed which shall be in excess of the maximum legal interest rate chargeable under Florida law.

F.    Past Due Rate.  A rate of interest equal to the maximum interest rate allowed by applicable law.

G.    Lender.  **A&D MORTGAGE LLC, a Florida limited liability company,** or any future owner or holder of this Note, including pledges and transfers of this Note and/or Security Documents, or any of them, or any person or entity acquiring or owning a participation interest hereon or therein.

H.    Property.  The real property identified on the Mortgage, together with all improvements thereon, and all right, title and interest of Borrower, if any, in and to all trade names, hereafter used in connection with the operation of the Property, and all related marks, logos, and insignia, to the extent they are assignable.

I.    Security Documents.  The Mortgage and Security Agreement, the Assignment of Leases, Rents and Profits of even date herewith, and any other documents or instruments now or hereafter securing this Note, or evidencing or securing the obligations secured by the Mortgage.

J.    Other Terms.  Capitalized terms used in this Note and not defined herein shall have the meaning given them in the Security Documents.

K.    Guarantors.  YURY GNESIN, ELENA TEMNIKOVA AND MAXIM TEMNIKOV

1.    Interest Rate.  The unpaid principal balance under the Note shall bear interest at an INITIAL RATE of 5.75%, which rate shall be applicable during the initial SIXTY (60) MONTHS of the loan; thereafter the interest rate Borrower will pay may change on the first day of September, 2022, and on that day every 12th month thereafter. Each date on which Borrower's interest rate could change is called a "Change Date."  Beginning with the first Change Date, the interest

1

rate will be recalculated at a rate of 450 basis points above the Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index value available as of the date 45 days before each Change Date is called the "Current Index," provided that if the Current Index is less than zero, then the Current Index will be deemed to be zero for purposes of calculating my interest rate. If for any reason such rate is not available, the Lender shall calculate the LIBOR using such alternative index for the London interbank offered rate as the Lender may determine in its sole discretion. Notwithstanding anything contained in this Section to the contrary, the interest rate shall never be lower than 5.75% PER ANNUM.

2.    Monthly Payments.    Borrower shall make monthly payments of PRINCIPAL AND INTEREST based upon the applicable interest rate as computed in paragraph 1 hereinabove, and based on an amortization period resulting in 300 equal payments, the final payment of which being due and payable on the MATURITY DATE. The initial rate shall be 5.75% and the initial payment shall be SIXTY-EIGHT THOUSAND TWO HUNDRED ONE 70/100 ($68,201.70) DOLLARS, and is due OCTOBER 1, 2017. Additional payments, as computed in paragraph 1 hereinabove, shall be due on the first of each and every month thereafter, through and including August 1, 2027, thereafter, on the MATURITY DATE the entire balance shall be due and payable.

3.    Maturity Date.    The entire balance of principal and accrued interest and other amounts then outstanding on this Note are due and payable on the Maturity Date. BORROWER ACKNOWLEDGES THAT THERE WILL BE A BALLOON PAYMENT DUE AT MATURITY.

4.    Application of Payments.    Each payment hereunder shall be applied when received first to the payment of any unpaid Past Due Charge and then to the payment of current interest on the principal balance from time to time remaining unpaid and then to reduce principal, except that if any amounts due under the terms of any Security Document have not been repaid, then any monies received, at the option of Lender, may first be applied to repay such amounts and interest thereon and the balance, if any, shall be applied as herein specified. No such application by Lender shall constitute a cure or waiver of any default by Borrower under the Security Documents or under this Note.

5.    Default; Acceleration.    This Note is secured by the Mortgage and other Security Documents. If any payment required to be made by the terms of this Note, or by the terms of any Security Document is not paid on or before the due date therefor or in the event of any default on the part of Borrower in the performance of any other obligations on its part to be performed under this Note or any Security Document then, or at any time thereafter, the whole of the unpaid principal hereof, together with accrued interest and outstanding default interest, shall, at the election of Lender and WITHOUT REQUIREMENT OF NOTICE of such election, become immediately due and payable. Lender's election may be exercised at any time after such event, and the acceptance of one or more payments hereon from any person thereafter shall not constitute a waiver of Lender's election, or of its option to make such election.

6.    Minimum Interest; Partial Prepayment; Prepayment Fee.    In the event Borrower prepays the loan in full prior to Borrower make a minimum of twenty-four (24) months payments totaling $1,242,401.38 in interest, Borrower agrees to pay to Lender an amount equal to the difference between $1,242,401.38 (Minimum Interest) and the amount of interest previously accrued in addition to any other amounts due and owing hereunder. Thereafter the entire principal amount outstanding may be prepaid in full at any time with no prepayment fee. Partial prepayments of principal are permitted only on a scheduled payment date, and only in increments of $100,000.00. After maturity or default, this Promissory Note shall bear interest at the highest rate permitted under the then applicable law.

ACCELERATION OF THE DEBT AS SET FORTH HEREINABOVE CONSTITUTES AN INVOLUNTARY PREPAYMENT FOR WHICH THE PREPAYMENT FEE PROVIDED FOR ELSEWHERE HEREIN SHALL BE DUE AND PAYABLE. THIS SPECIFIC COLLECTION OF A PREPAYMENT FEE WAS SPECIFICALLY BARGAINED FOR AS A CONSIDERATION FOR THE EXTENSION OF CREDIT BASED UPON THE INTEREST RATE GRANTED BY LENDER. BORROWER ACKNOWLEDGES AND AGREES THAT SUCH PREPAYMENT FEE REPRESENTS A REASONABLE AND FAIR ESTIMATE OF COMPENSATION FOR THE LOSS THAT HOLDER MAY SUSTAIN FROM THE PREPAYMENT OF THIS NOTE. BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS NO RIGHT TO PREPAY THIS NOTE WITHOUT THE PREPAYMENT FEE EXCEPT AS SPECIFICALLY PROVIDED HEREINABOVE, AND BORROWER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT SHALL BE LIABLE FOR THE PREPAYMENT FEE ON ANY ACCELERATION OF THIS NOTE IN ACCORDANCE WITH ITS

TERMS AT ANY TIME. IN THE EVENT OF AN ACCELERATION, THE APPLICABILITY OF AND AMOUNT OF THE PREPAYMENT FEE SHALL BE DETERMINED BY HOLDER AS OF THE DATE LENDER DECLARES THE LOAN ACCELERATED, AND SHALL BE DUE AND PAYABLE ON THE DATE THEREOF.

7. <u>Past Due Charge and Past Due Interest Rate</u>.

7.1 Past Due Charge. Borrower recognizes and acknowledges that the failure to make any payment, on or before the date when due hereunder or to be made under any Security Document, will result in losses and additional expenses to Lender in servicing the indebtedness evidenced hereby, and in losses due to Lender's loss of the use of funds not timely received. Borrower further acknowledges and agrees that in the event of any such failure, Lender would be entitled to damages for the detriment proximately caused thereby, but that it would be extremely difficult and impracticable to ascertain the extent of or compute such damages. Therefore, if for any reason Borrower fails to pay when due any interest or principal under this Note, including any payment due at maturity or upon acceleration, or fails to pay any amounts due under any of the Security Documents, or if payment of the principal amount hereof is not made on the Maturity Date of this Note or after acceleration of the indebtedness under this Note, Borrower shall pay to Lender, in addition to any such delinquent payment, an amount equal to the Past Due Charge calculated on such delinquent payment.

7.2 Past Due Interest Rate. If for any reason Borrower fails to make any payment when due, then the applicable interest rate shall be the Past Due Rate. Each such delinquent payment shall also bear Additional Interest, commencing on the day following the date such delinquent payment was due and continuing for so long as the delinquency continues, regardless of whether or not there has been an acceleration of the indebtedness under this Note, computed at the Past Due Rate until paid, such Additional Interest to be compounded annually. Borrower acknowledges that the Past Due Charge and Additional Interest agreed to hereunder represent the reasonable estimate of those damages which would be incurred by the Lender, and a fair return to Lender of the loss of the use of the funds not timely received from Borrower on account of a default by Borrower as herein specified, established by Borrower and Lender through good faith consideration of the facts and circumstances surrounding the transaction contemplated under this Note as of the date hereof, but that such Past Due Charge and Additional Interest are in addition to, and not in lieu of, any other right or remedy available to Lender from the date of default through and including the foreclosure sale. If any federal or state law applicable pursuant to Section 12.6 below proscribes the imposition of a past due charge in the amount of the Past Due Charge herein specified, or limits the rate of the Additional Interest that may be charged to a rate less than the Past Due Rate herein specified, then the maximum charge or rate permitted by such law shall be charged by Lender for the Purposes of this Section.

8. <u>Collection and Enforcement Costs</u>. Borrower agrees to pay all costs of collection, including reasonable attorney's fees actually incurred (whether or not for salaried attorneys regularly employed by Lender) and all costs of any action or proceeding (including, but without limitation, commencement of non-judicial foreclosure or private sale), in case any payment is not paid when due, or in case it becomes necessary to enforce any other obligation of Borrower hereunder or to protect the security for the indebtedness evidenced hereby, or for the foreclosure by Lender of the Mortgage and Security Agreement or any other Security Document, or for the premium payable for an Owner's policy of Title Insurance in the event Lender acquires title to the Property (or any portion thereof) through foreclosure of the Mortgage or acceptance of a deed in lieu of foreclosure, or in the event Lender is made a party to any litigation because of the existence of the Security documents, or any of them. All such costs are secured by the Mortgage and Security Agreement and other Security Documents. Borrower understands and agrees that Lender's attorneys are physically located in Broward County, Florida, and that all of the costs referred to above, will include all fees and costs incurred in traveling to and from the jurisdiction where this property is located. In any court action reasonable attorney fees shall be determined by the Court based on affidavits submitted by the parties and no expert testimony shall be permitted unless specifically ordered by the Court.

9. <u>Waivers</u>.Borrower waives diligence, presentment, protest and demand, notice of protest, of demand, of nonpayment, of dishonor of default and of maturity and agrees that time is of the essence of every provision hereof; and consents to any and all renewals, extensions or modifications of the terms hereof or the Security Documents, or any of them, including time for payment, and further agrees that any such renewal, extension or modification, or the release or substitution of any person or security for the indebtedness evidenced hereby, shall not affect the liability of any such parties for the indebtedness evidenced by this Note or the obligations under the Security Documents. Any such renewals, extensions, modifications, releases or substitutions may be made without notice to any of such parties.

3

10.    <u>Remedies Cumulative</u>.  The rights and remedies of Lender as provided in this Note and in the Security Documents shall be cumulative and concurrent and may be pursued singly, successively or together against Borrower, the Property, or any other persons or entities who are, or may become liable for all or any part of this indebtedness, more specifically including the Guarantors hereof, and any other funds, property or security held by Lender for the payment hereof, or otherwise, at the sole discretion of Lender.  Failure to exercise any such right or remedy shall in no event be construed as a waiver or release of such rights or remedies, or the right to exercise them at a later time.  The right, if any, or Borrower, and all other persons or entities who are or may become liable for this indebtedness, to plead any and all statutes of limitation as a defense is expressly waived by each and all such parties to the full extent permissible by law.

11.    <u>Mortgage Provisions Regarding Transfer, Successors</u>.  The Mortgage securing this Note contains provisions for the acceleration of the indebtedness evidenced hereby upon a Transfer specified in the Mortgage, the provisions hereof shall be binding on the heirs, legal representatives, guarantors, successors and assigns of Borrower and shall inure to the benefit of the successors and assigns of Lender.

12.    <u>Miscellaneous</u>.

12.1    <u>Payment in Lawful Money; No Offsets.</u>  All payments due hereunder shall be made in lawful money of the United States of America. All sums due hereunder shall be payable without offset, demand, abatement of counterclaim of any kind or nature whatsoever, all of which are hereby waived by Borrower.

12.2    <u>Fee for Statement</u>.  For any statement regarding the obligations secured hereby requested to be furnished by Lender, Borrower shall pay the fee then charged by Lender therefor, not to exceed, however, the maximum fee, if any, allowed to be charged by Lender by law at the time such statement is requested.

12.3    <u>Servicing Fees</u>.  The Lender has the right to transfer the servicing of this loan to any servicing agent of its choice.  In the event that there are any charges incurred in connection with the servicing of this loan, any and all charges associated with the servicing shall be paid by the Borrower.  The servicing agent shall provide Borrower with notice of the cost of servicing which shall be added to the regular monthly payment set forth in Paragraph 2 of this Note.

12.4    <u>No Amendment or Waiver Except in Writing</u>.  This Note may be amended or modified only by a writing duly executed by Borrower and Lender, which expressly refers to this Note and the intent of the parties to amend this Note.  No provision of this Note may be waived by Lender, except by instrument in writing executed by Lender which expressly refers to this Note, and no such waiver shall be implied from any act or conduct of Lender, or any omission by Lender to take action with respect to any provision of this Note or any Security document.  No such express written waiver shall affect any other provision of this Note, or cover any default or time periods or event, other than the matter as to which as express written waiver has been given.

12.5    <u>No Intent of Usury</u>.  None of the terms and provisions contained in this Note, or in any Security document, or in other documents or instruments related hereto, shall ever be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate in excess of the maximum interest rate permitted to be charged buy applicable federal or state laws or regulations governing this Note ("Usury Laws").  Borrower shall never be required to [pay interest on this Note at a rate in excess of the maximum interest that may be lawfully charged under such Usury Laws, as made applicable by the final judgment of a court of competent jurisdiction, and the provisions of this Section shall control over all other provisions hereof and of any other instrument executed in connection herewith or executed to secure the indebtedness evidenced hereby, which may be in apparent conflict with this Section.  If Lender collects monies which are deemed to constitute interest which would otherwise increase the effective interest rate on this Note to a rate in excess of that permitted to be charged by such Usury Laws, all such sums deemed to constitute interest in excess of the maximum rate shall, at the option of Lender, either be credited to the payment of principal or returned to Borrower.

12.6    <u>Governing Law</u>.  This Note shall be governed by and construed and enforced in accordance with the laws of the United States of America, and any rules, regulations, or orders issued or promulgated thereunder, applicable to the affairs of, or transactions entered into by, Lender and this Note shall, to the extent not covered thereby, otherwise be governed by and shall be construed and enforced in accordance with the laws of Florida, venue lying in the county in which the mortgaged property securing this Note is situated.

12.7    Certain Rules of Construction. The heading of each Section of this Note are for convenience only and do not define or limit any provision of this Note. The Provisions of this Note shall be construed as a whole according to their common meaning, not strictly for or against any party, person or entity who is or may become liable for the payment of this Note, and to achieve the objectives of the parties unconditionally to impose on Borrower the indebtedness evidenced by this Note.

12.8    Severability. If any terms of this Note, or the application thereof to any person or circumstances, shall be invalid or unenforceable, the remainder of this Note, or the application of such term to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affect thereby and each term of this Note shall be valid and enforceable to the fullest extent permitted by law.

12.9    Post-judgment interest. Post-judgment interest shall accrue on all sums found to be due and owing from the makers, endorsers, guarantors and all other parties liable hereunder, at the highest rate allowed by applicable law.

12.10    Annual Review. Lender may conduct an annual review of Borrower's Loan. Borrower and Guarantors agree that Lender may obtain credit reports on Borrower and Guarantors at any time, at Lender's sole option and expense, for any reason including, but not limited to determining whether there has been an adverse change in Borrower or Guarantors' financial condition. Borrower agrees to maintain a Debt-Service-Coverage Ratio (DSC ratio) of 1.2 or better on the mortgaged property during the entire life of the loan. The Net Operating Income and Debt Service Coverage Ratio are to be calculated according to the Lender's usual underwriting methods and standards. Should the DSC ratio fail to meet the 1.2 requirement, then the Borrower shall be in default and the whole of the unpaid principal hereof, together with accrued interest and outstanding default interest, and in addition, any minimum interest amount, shall, at the election of lender and without necessity of further notice of such election, become immediately due and payable. Lender's election may be exercised at any time after such event, and the acceptance of one or more payments hereon from any person thereafter shall not constitute a waiver of lender's election, or of its option to make such election. Lender may at Lender's option request a pay down of the principal in order to meet the ratio.

13.    U.S. Reporting. The right to principal of, and stated interest on, this obligation is not negotiable by endorsement of the Holder or any assignee of the Holder unless such endorsement is accompanied by the following actions of the Borrower:

13.1    The Borrower shall maintain a registry of ownership of this obligation (the "Registry");

13.2    The Registry shall reflect the Lender as the original Holder of this obligation, and shall reflect such subsequent transferee as the Borrower who shall receive notice thereof, by delivery to it of a certified copy of the assignment of the Note duly executed by the then current Holder thereof; and

13.3    Notices of assignment of this Note shall be furnished by the Holder (as reflected in the Registry) to the Borrower by certified or registered mail.

No transfer of this obligation shall be valid unless reflected in the Registry in accordance with the provision of the above paragraph. The interest payable under this obligation is intended to qualify for the "portfolio interest exemption" from U.S. taxation and the obligation is intended to be treated as a registered obligation and shall be interpreted accordingly. To the extent the obligation and interest payments otherwise qualify for such exemption, and the Lender otherwise complies with the procedural requirements (including providing the Borrower with W-8 information), the Borrower shall not withhold U.S. tax with respect to interest payments and Borrower shall comply with the appropriate U.S. reporting, including the filing of Forms 1042 and 1042S as may be required.

14.    Documentary Tax. The state documentary tax due on this Note has been paid and the proper stamps have been affixed to the Mortgage securing this indebtedness.

15. Waiver of right to Jury Trial. Each borrower, guarantor and endorser hereby knowingly, voluntarily and

intentionally waives the right either may have to a trial by jury in respect of any litigation based hereon or arising out of, under or in connection with this Promissory Note, the Mortgage, the security documents executed in connection therewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party. This provision is a material inducement to the making of the loan to maker by the lender and lender's successors and assigns, and to the advance or other extension of credit to the maker. Maker represents and warrants that the waivers contained in this paragraph have been freely and voluntarily made after reviewing same with counsel of maker's choice. This provision shall be binding upon any party who, at any time hereafter, assumes the obligation to pay this Promissory Note.

IN WITNESS WHEREOF, the undersigned have executed this Note on the day and year set forth above.

**BORROWER:** MY FL MANAGEMENT, LLC, a Florida limited liability company

BY: _____
　　　 YURY GNESIN, as Manager

BY: STAR MANAGEMENT, LLC, a Delaware limited liability company, as Manager

BY: _____
　　　 ELENA TEMNIKOVA, as Manager

**BORROWER:** MY FL 3821 LLC, a Florida limited liability company

BY: MY FL MANAGEMENT, LLC, a Florida limited liability company, as Manager

BY: _____
　　　 YURY GNESIN, as Manager

BY: STAR MANAGEMENT, LLC, a Delaware limited liability company, as Manager

BY: _____
　　　 ELENA TEMNIKOVA, as Manager

**BORROWER:** MY FL 3811 LLC, a Florida limited liability company

BY: MY FL MANAGEMENT, LLC, a Florida limited liability company, as Manager

BY: _____
　　　 YURY GNESIN, as Manager

BY: STAR MANAGEMENT, LLC, a Delaware limited liability company, as Manager

BY: _____
　　　 ELENA TEMNIKOVA, as Manager

**BORROWER:** RENTAL VACATION PROPERTY LLC, a Florida limited liability company

BY: _____
　　　 YURY GNESIN, as Manager

GUARANTORS:

_____
YURY GNESIN

_____
MAXIM TEMNIKOV

_____
ELENA TEMNIKOVA

# Exhibit "B"

Prepared by:    David J. Wallace, Esq.
Return to:       215 North Federal Highway
               Dania Beach, FL 33004

**THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS $8,362,569.01 TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.**

### MORTGAGE, SECURITY AGREEMENT AND ASSIGNMENT OF RENTS AND LEASES

THIS MORTGAGE, made this 5th day of September, 2017 between MY FL 3821, LLC, a Florida limited liability company (as to Parcel 1), MY FL 3811, LLC, a Florida limited liability company (as to Parcel 2), RENTALS VACATION PROPERTY, LLC, a Florida limited liability company (as to Parcel 3) and MY FL MANAGEMENT, LLC, a Florida limited liability company (as to Parcel 4 and Easement), as Mortgagor and Debtor, whose mailing address is 3711 North Ocean Blvd, Fort Lauderdale, Florida 33308 ("Borrower"), and A&D MORTGAGE LLC, a Florida limited liability company whose mailing address is 1040 South Federal Highway, Hollywood, Florida, 33020, ("Lender");

### W I T N E S S E T H :

WHEREAS, Borrower is justly indebted to Lender in the principal sum of **ELEVEN MILLION and 00/100 Dollars ($11,000,000.00)** as evidenced by a certain Promissory Note (the "Note") of even date herewith, executed by Borrower and delivered to Lender, which provides for a maturity date of **SEPTEMBER 1, 2027,** payable according to the terms therein provided, and by reference being made a part hereof to the same extent as though set out in full herein;

NOW THIS INDENTURE WITNESSETH, to secure the performance and observance by the Borrower of all the covenants and conditions in the Note and in this Mortgage, and in order to charge the properties, interest and rights hereinafter described with such payment, performance and observance, and for and in consideration of the sum of TEN and NO/100 DOLLARS ($10.00) paid by the Lender to the Borrower on or before the delivery of this Mortgage, and for other valuable considerations, the receipt of which is hereby acknowledged, the Borrower does hereby grant, bargain, sell, alien, remise, release, convey, assign, transfer, mortgage, hypothecate, pledge, deliver, set over, warrant and confirm unto the Lender, its successors and assigns forever:

### THE MORTGAGED PROPERTY

All that certain piece, parcel or tract of land situate in the County of **BROWARD** and State of Florida (hereinafter called the "Land"), more particularly described as follows, to wit:

### SEE ATTACHED EXHBIT "A"

TOGETHER WITH all buildings, structures and improvements of every nature whatsoever now or hereafter situated on the Land, and all fixtures, machinery, equipment, furniture and other tangible personal property of every nature whatsoever now or hereafter owned by the Borrower and located in, on, or used or intended to be used in connection with or with the operation of the Land, buildings, structures or other improvements now or hereafter located on the Land, including all extensions, additions, improvements, betterments, renewals, and replacements to any of the foregoing; and all of the right, title and interest of the Borrower in any such personal property or fixtures, together with the benefit of any deposits or payments now or hereafter made by the Borrower or on its behalf;

TOGETHER WITH all easements, rights of way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances whatsoever, in any way belonging relating or appertaining to any of the property hereinabove described, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Borrower, and the reversion and reversions, remainder and remainders, rents, issues, profits thereof, and

Page **1** of **20**

all the estate, right, title, interest, property, possession, claim and demand whatsoever, at law as well as in equity, of Borrower of, in and to the same, including but not limited to all judgments, awards of damages and settlements hereafter made resulting from condemnation proceedings or the taking of the Mortgage Property or any part thereof under the power of eminent domain, the alteration of the grade of any street, or for any damage (whether caused by such taking or otherwise) to the Mortgaged Property or any part thereof, or to any rights appurtenance thereto, and all proceeds of any sales or other dispositions of the Mortgaged Property or any part thereof;

TOGETHER WITH all rents, royalties, issues, profits, revenue, income and other benefits from the Mortgaged Property to be applied against the indebtedness secured hereby, provided however, that permission is hereby given to Borrower so long as no Default has occurred hereunder, to collect, receive, take, use and enjoy such rents, royalties, issues, profits, revenue, income, licenses, foreclosures, concessions and other benefits as they become due and payable, but not more than two months in advance thereof. Lender shall be entitled, at its option upon the occurrence of a Default hereunder, to all rents, royalties, issues, profits, revenue, income and other benefits from the Mortgaged Property, whether or not Lender takes possession of the Mortgaged Property, from and after the date of such default, it being agreed that the assignment of rents hereunder shall be absolute upon the Borrower's default, in accordance with Section 697.07, Florida Statutes, and if a court of competent jurisdiction shall require Borrower to deposit such rents in the registry of the court pending adjudication of the Lender's right thereto, Borrower agrees that the rents to be deposited shall consist of those which are in the possession, custody or control of Borrower or its agents or employees as of the date of default and all rents paid or payable to or received by Borrower or its agents or employees thereafter. Upon any such occurrence of a Default hereunder, the permission hereby given to Borrower to collect such rents, royalties, issues, profits, revenue, income and other benefits from the Mortgaged Property shall terminate and such permission shall not be reinstated upon a cure of the Default without Lender's express written consent. Exercise of rights under this paragraph, and the application of any such rents, royalties, issues, profits, revenue, income or other benefits to such indebtedness, shall not cure or waive any Default or notice of Default hereunder or invalidate any act done pursuant hereto, but shall be cumulative and in addition to all other rights and remedies of Lender;

TOGETHER WITH all right, title and interest of Borrower in and to any and all leases now or hereafter on or affecting the Mortgaged Property, together with all security therefor and all monies payable thereunder, subject, however, to the conditional permission hereinabove given to Borrower to collect the rentals under such leases. The foregoing assignment of any leases shall not be deemed to impose upon Lender any of the obligations or duties of Borrower provided in any such leases, and Borrower agrees to fully perform all obligations of the lessor under all such leases. Upon Lender's request, Borrower agrees to send to Lender a list of all leases covered by the foregoing assignment and as any such lease shall expire or terminate or as any new lease shall be made, Borrower shall so notify Lender in order that at all times Lender shall have a current list of all leases affecting the Mortgage Property. Lender shall have the right, at any time and from time to time, to notify any lessee of the rights of Lender as provided by this paragraph and any lessee shall be entitled to rely, with confirmation, on any notice received from Lender. From time to time, upon request of Lender, Borrower shall specifically assign to Lender as additional security hereunder, by an assignment in writing in form approved by Lender, all right, title and interest of Borrower in and to any and all leases now or hereafter on or affecting the Mortgaged Property, together with all security therefor and all monies payable thereunder, subject to the conditional permission hereinabove given to Borrower to collect the rentals under any such leases. Borrower shall also execute and deliver to Lender any notification, financing statement, or other document reasonably required by Lender to perfect the foregoing assignment as to any such leases;

THIS instrument constitutes an absolute and present assignment of the rents, royalties, issues, profits, revenue, income, and other benefits from the Mortgaged Property, subject, however, to the conditional permission given to Borrower to collect, receive, take, use and enjoy the same as provided hereinabove; provided, further, that the existence or exercise of such right of Borrower shall not operate to subordinate this assignment to any subsequent assignment, in whole or in part, by Borrower, and any such subsequent assignment by Borrower shall be subject to the rights of Lender hereunder;

TOGETHER WITH all of Borrower's right, power or privilege to further encumber any of the Mortgaged Property for debt;

TOGETHER WITH all of the proceeds of the conversion, voluntary or involuntary, of any of the Mortgaged Property described herein into cash or other liquidated claims, or that are otherwise payable for injury to, or the taking or requisitioning of, the Mortgaged Property, including all insurance and condemnation proceeds.

TOGETHER WITH all of Borrower's right, title and interest in and to any and all contracts, written or oral, expressed or implied, now existing or hereafter entered into or arising, to the extent such are related to the improvement, use, operation, sale, conversion, or other disposition of any interest in the Mortgaged Property, including any and all deposits, prepaid items,

and payments due and to become due thereunder, and including construction contracts, service contracts, advertising contracts, purchase orders, and equipment leases.

TOGETHER WITH all right, title and interest of Borrower, if any, in and to all trade names hereafter used in connection with the operation of the Land, and all related marks, logos, and insignia, to the extent they are assignable.

TOGETHER WITH all contract rights, accounts, instruments, and general intangibles, as such terms from time to time are defined in the Uniform Commercial Code, to the extent such are related to the use, operation, sale, conversion, or other disposition (voluntary or involuntary) of the Mortgaged Property, including all such permits, licenses, insurance policies, rights of actions, and other choses in action.

The land, together with any and all of the aforedescribed additional property and rights, now or hereafter acquired by Borrower shall sometimes herein be referred to as the "Mortgaged Property.

Borrower (Debtor) hereby grants to Lender (Secured Party) a security interest in the Mortgaged Property to the extent permitted under the Uniform Commercial Code. This Mortgage is a self-operative security agreement with respect to such property, but Borrower agrees to execute and deliver on demand such other security agreements, financing statements, and other instruments as Lender may request in order to perfect its security interest or to impose the lien hereof more specifically upon any of such property. Lender shall have all rights and remedies, in addition to those specified herein, of a secured party under the Uniform Commercial Code.

TO HAVE AND TO HOLD the Mortgaged Property and all parts thereof unto the Lender, its successors and assigns, subject, however, to the terms and conditions herein;

PROVIDED, HOWEVER, that these presents are upon the condition that, if the Borrower shall pay or cause to be paid to the Lender the principal and interest payable in respect to the Note, at the times and in the manner stipulated therein and herein, all without any deduction or credit for taxes or other similar charges paid by the borrower, and shall keep, perform and observe all and singular the covenants and promises in the Note, and any renewal, extension or modification thereof and in this Mortgage expressed to be kept, performed and observed by and on the part of the Borrower, all without fraud or delay, then this Mortgage, and all the properties, interests and rights hereby granted bargained, sold, alienated, remised, released, conveyed, assigned, transferred, mortgaged, hypothecated, pledged, delivered, set over, warranted and confirmed, shall cease, terminate and be void (and Lender shall cause this Mortgage and other loan documents to be released of record), but shall otherwise remain in full force and effect;

AND, Borrower covenants and agrees with Lender as follows:

## ARTICLE ONE

### PARTICULAR COVENANTS OF BORROWER

1.01    Performance of Note and Mortgage.  The Borrower will perform, observe and comply with all the provisions hereof and of the Note secured hereby, and will promptly pay to the Lender the sum of money expressed in the Note with interest thereon and all other sums required to be paid by the Borrower pursuant to the provisions of this Mortgage on the days when payment shall become due, all without deduction or credit for taxes or other similar charges paid by the Borrower, time being of the essence for such payments.

1.02    Warranty of Title.  The Borrower covenants that it is indefeasibly seized of the Land in fee simple, has good and absolute title to all existing personal property hereby mortgaged and has full power and lawful right to convey and mortgage the same in the manner and form aforesaid. The Borrower hereby makes further assurances to perfect its fee simple interest in the Land as Lender may reasonably require. The Borrower does hereby fully warrant the title to the Mortgaged Property against the lawful claims of all persons whomsoever.

1.03    Taxes, Liens, and Utility Charges.

(a) Borrower covenants and agrees to pay all lawfully imposed taxes and assessments upon the Mortgaged

Page **3** of **20**

Property on or before the date the same become due and shall not permit such taxes and assessments to become delinquent.

(b) The Borrower covenants and agrees to pay or discharge, prior to delinquency, any and all governmental levies that may be made on this Mortgage or the Note or in any other way resulting from the mortgage indebtedness secured by this Mortgage.

(c) The Borrower shall not permit any mechanic's, laborer's, statutory or other lien to remain outstanding upon any of the Mortgaged Property and shall cause same to be released and discharged, or transferred to bond as permitted by law. Borrower shall have fifteen days after written notice from Lender to remove any lien on the Mortgaged Property.

(d) In the event of the passage of any state, federal, municipal or other governmental law, order, rule or regulation, subsequent to the date hereof, in any manner changing or modifying the laws now in force governing the taxation of mortgages or debts secured by mortgages (which are in the nature of documentary stamps or intangible taxes), or the manner of collecting taxes (which are in the nature of documentary stamps or intangible taxes) so as to adversely affect the Lender with respect to this Mortgage, at the option of the Lender, the entire balance of the principal sum secured by this Mortgage and all interest accrued thereon shall without notice become immediately due and payable; provided, however, that Lender shall not be entitled to accelerate the indebtedness under this provision if Borrower pays to Lender the amount of any adverse charge, tax or fee imposed on Lender.

(e) The Borrower will pay when due, and will not suffer to remain outstanding, any charges for utilities, whether public or private, with respect to the Mortgaged Property.

1.04 Insurance.

(a) Borrower shall procure for, deliver to and maintain for the benefit of Lender during the term of this Mortgage, original paid-up insurance policies or certified copies of blanket policies of such insurance companies, in such amounts, in such form and substance, and with expiration dates as are reasonably acceptable to Lender and containing Lender's Loss Payable endorsement (Form 438 B.F.U.), Lender Clause (Form 127B) or other acceptable non-contributory Lender clause, their equivalent or a satisfactory Lender loss payable endorsement in favor of Lender, providing the following types of insurance covering the Mortgaged Property and the interest and liabilities incident to the ownership, possession and operation thereof, to wit:

(i) insurance against loss or damage by Flood (in the event the Land is designated as flood prone or a flood risk area or flood insurance is required pursuant to the United States Flood Disaster Protection Act of 1973, as amended or supplemented or under any subsequent law then in effect) and by fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, aircraft, vehicles, smoke, vandalism and malicious mischief and against such other hazard as, under good insurance practices, from time to time are insured against for properties of similar character and location, the amount of which insurance shall not be less than one hundred percent (100%) of the full insurable replacement value of the Mortgaged Property without deduction for depreciation, and which policies of insurance shall contain satisfactory replacement cost endorsements; and

(ii) such other insurance on the Mortgaged Property or any replacement or substitutions therefor and in such amounts as may from time to time be reasonably required by Lender against other insurable casualties which at the time are commonly insured against in the case of properties of similar character and location, due regard being given to the height and type of the improvements, its construction, location, use and occupancy, or any replacements or substitutions therefor.

(b) Lender is hereby authorized and empowered, at its option, to adjust or compromise any loss under any insurance policies maintained pursuant to this Paragraph 1.04, and to collect and receive the proceeds from any such policy or policies. Each insurance company is hereby authorized and directed to make payment for all such losses directly to Lender, instead of to borrower and Lender jointly. In the event any insurance company fails to disburse directly and solely to Lender but disburses instead either solely to Borrower or to Borrower and Lender jointly, Borrower agrees immediately to endorse and transfer such proceeds to Lender. Upon the failure of Borrower to endorse and transfer such proceeds as aforesaid, Lender may execute such endorsements or transfers for and in the name of Borrower and Borrower hereby irrevocably appoints Lender as Borrower's agent and attorney-in-fact, coupled with an interest, so to do. After deducting from said insurance proceeds all of its expenses incurred in the collection and administration of such sums, including attorney's fees, Lender may apply the net proceeds or any part thereof, at its option, (i) to the payment of the indebtedness, whether or not due and in whatever order Lender elects, (ii) to the repair and/or restoration of the Mortgaged Property, and/or (iii) for any other purposes or objects for

Page 4 of 20

which Lender is entitled to advance funds under this Mortgage, all without affecting the security interest created by this Mortgage; and any balance of such moneys then remaining shall be paid thereto. Notwithstanding any provision of this paragraph 1.04, Lender shall hold the proceeds in a non-interest bearing account and make the proceeds of insurance available to reimburse the Borrower or pay on the Borrower's behalf for the repair of the improvements on the Land subject to the following terms and conditions: (a) that Borrower is not then in default under any of the terms, covenants and conditions of the Note, this Mortgage or any other agreement securing the Note and at all times while restoration work progresses no such Default shall occur; (b) that Lender shall first be satisfied that by the expenditure of such insurance proceeds the improvements will be fully restored within a reasonable period of time to its value immediately preceding the loss or damage, free and clear of all liens, except as to the lien of this Mortgage and such other liens as are specifically permitted herein or hereafter consented to by Lender in writing under this Mortgage; (c) that in the event such proceeds shall be insufficient to restore or rebuild such improvements, in Lender's judgment, Borrower shall deposit promptly with Lender funds which, together with the insurance proceeds, shall be sufficient in Lender's judgment to restore and rebuild the property; (d) that Borrower shall make best efforts to obtain a waiver of the right of subrogation from any insurer under such policies of insurance who, at that time, claims that no liability exists as to Borrower or the then owner or the assured under such policies: (e) that the excess of such insurance proceeds above the amount necessary to complete such restoration and compensate Borrower for all other insured losses shall be applied on account of the indebtedness or obligation hereby secured; (f) Lender reviews and approves in writing the plans and specifications for the restoration work; (g) Borrower shall have furnished to Lender for Lender's approval a detailed budget and cost breakdown for said restoration work signed by borrower and describing the nature and type of expenses and amounts thereof estimated by borrower for said restoration work, including, but not limited to, the cost of material and supplies, architect and designer fees, general contractor's fees, and the anticipated monthly disbursement schedule, and Lender shall have given to Borrower written approval of such budget and cost breakdown (if borrower determines that its actual expenses differ from its estimated budget, it will so advise Lender promptly); (h) in Lender's judgment, such restoration work can be completed prior to the maturity of the Note and (i) that Borrower shall deposit with Lender such sums as Lender may reasonably require for the repayment of the installments due under the Note, as specified therein, pending completion of repair. In the event any of such conditions are not or cannot be satisfied, then such insurance proceeds shall be disposed of as otherwise provided above. Under no circumstances shall Lender become obligated to itself take any action to restore such property. No insurance proceeds at any time held by Lender hereunder shall be deemed to be held in trust, and Lender may commingle such proceeds with its general assets. All such work shall be promptly commenced and diligently prosecuted to completion in accordance with the plans and specifications therefor, and such proceeds shall be disbursed upon the disbursing party being furnished with satisfactory evidence of the cost of completion thereof and with architect's certificates, waivers of lien, contractors, and subcontractors' sworn statements, title policy continuations and other evidence of cost and payments so that the disbursing party can verify that the amounts disbursed from time to time are represented by completed and in-place work and that the work if free and clear of mechanic's lien claims. As to each contractor, no payment made prior to the final completion of such contractor's work shall exceed ninety percent (90%) of the value of the work performed from time to time by such contractor and at all times the undisbursed balance of such proceeds remaining in the hands of the disbursing party shall be at least sufficient to pay for the cost of completion of such contractor's work shall exceed ninety percent (90%) of the value of the work performed from time to time by such contractor and at all times the undisbursed balance of such proceeds remaining in the hands of the disbursing party shall be at least sufficient to pay for the cost of completion of the work free and clear of any and all liens. Any surplus which may remain out of said proceeds, after payment of the cost of repair, rebuilding or restoration, shall, at the option of the Lender, be applied on account of the indebtedness secured hereby or be paid to any party entitled thereto as the same appear on the records of the Lender. If the insurance proceeds or any of them are applied to the payment of the sums secured by this Mortgage, any such application of proceeds to principal shall be in such order as Lender may determine and, if after so applying such insurance proceeds the Lender reasonably determines the remaining security to be inadequate to secure the remaining indebtedness, Borrower shall, upon written demand from the Lender prepay on principal such an amount as will reduce the remaining indebtedness to a balance for which adequate security is present. Lender shall not be held responsible for any failure to collect any insurance proceeds due under the terms of any policy regardless of the cause of such failure.

(c) At least fifteen (15) days prior to the expiration of each policy maintained pursuant to this Paragraph 1.04, a renewal or replacement thereof satisfactory to Lender shall be delivered to Lender. Borrower shall deliver to Lender reasonable evidence of payment of all such insurance policies and renewals or replacements. Each policy maintained pursuant to this Paragraph 1.04 shall provide that the same cannot be canceled or coverage reduced or changed without at least thirty (30) days prior written notice to Lender. Blanket coverage policies are acceptable to Lender provided they contain stipulated value endorsements as to replacement cost. Should co-insurance or average clauses be included in any of said policies, Borrower shall obtain a Stipulated Value endorsement in form and content satisfactory to Lender. The delivery of any insurance policies hereunder shall constitute an assignment of all unearned premiums as further security hereunder. In the event of the foreclosure of this Mortgage or any other transfer of title to the Mortgaged Property in extinguishment or partial

extinguishment of the Indebtedness, all right, title and interest of Borrower in and to all insurance policies then in force shall pass to the purchaser or to Lender, as the case may be, and Lender is hereby irrevocably appointed by Borrower as attorney-in-fact for Borrower, coupled with an interest, to assign any such policy to said purchaser or to Lender, as the case may be, without accounting to Borrower for any unearned premiums thereon.

1.05    Monthly Deposits.    Upon Borrower default, the Lender may at its option and further to secure the payment of the taxes and assessments referred to in Paragraph 1.03 and the insurance policies referred to in Paragraph 1.04 require Borrower to deposit with Lender, on the due date of each installment under the Note, such amounts as, in the estimation of Lender, shall be necessary to pay such charges as they become due, to be calculated upon the basis of the prior year's tax bills and the current year's insurance premiums; said deposits to be held by Lender, free of interest, and free of any liens or claims on the part of creditors of Borrower and as part of the security of Lender, and to be used by Lender to pay current taxes and assessments on the Mortgaged Property and insurance premiums as the same accrue and are payable. Payment from said sums for said purposes shall be made by Lender at its discretion and may be made even though such payments will benefit subsequent owners of the Mortgaged Property. Said deposits shall not be, nor be deemed to be, trust funds but may be commingled with the general funds of Lender. If said deposits are insufficient to pay taxes and assessments and insurance premiums in full. Upon Default Lender may, at its option, apply any money in the fund resulting from said deposits to the payment of the indebtedness secured hereby in such manner as it may elect.

1.06    Condemnation.    If all or any part of the Mortgaged Property shall be damaged or taken through condemnation (which term when used in this Mortgage shall include any damage or taking by any governmental authority, and any transfer by private sale in lieu thereof, either temporarily or permanently) so that the remaining property is not adequate security for the outstanding indebtedness in the sole and absolute opinion of Lender, the entire indebtedness secured hereby shall at the option of Lender become immediately due and payable. The Lender shall be entitled to all compensation, awards, and any other payments of relief therefor and is hereby authorized, at its option to commence, appear in and prosecute, in its own or the Borrower's name, any action or proceeding relating to any condemnation, and to settle or compromise any claim in connection therewith. All such compensation, awards, damages, claims, rights of action and proceeds and the right thereto are hereby assigned by the Borrower to the Lender, who after deducting therefrom all its reasonable expenses including attorneys' fees, may release any monies so received by it without affecting the lien of this Mortgage or may apply the same in such manner as the Lender shall determine, to the reduction of the sums secured hereby, and any balance of such monies then remaining shall be paid to the Borrower. The Borrower agrees to execute such further assignments of any compensations, awards, damages, claims, rights of action and proceeds as the Lender may require. Notwithstanding the provisions of this Paragraph 1.06, if a condemnation award or any portion thereof is for repair or restoration of the Mortgaged Property then such award or portion of award shall be held by Lender and shall be made available to reimburse Borrower for such repair upon the same terms and conditions applicable to the proceeds of insurance as set forth in Paragraph 1.04(b).

1.07    Care of Property.

(a) The Borrower shall preserve and maintain the Mortgaged Property at all times in good condition and repair. Borrower shall not remove or demolish any building presently on or hereafter existing on the Land without the prior written consent of the Lender. Borrower shall not permit, commit or suffer any waste, impairment or deterioration of the Mortgaged Property or of any part thereof, and will not take any action which will increase the risk of fire or other hazard to the Mortgaged Property or to any part thereof.

(b) Except as otherwise expressly provided herein, no buildings, fixtures, personal property, or other part of the Mortgaged Property shall be removed, demolished or substantially altered without the prior written consent of the Lender. The Borrower may sell or otherwise dispose of, free from the lien of this Mortgage, furniture, furnishings, equipment, tools, appliances, machinery, fixtures, or appurtenances, which may become worn out, undesirable, obsolete, disused or unnecessary for use in the operation of the Mortgaged Property, upon replacing the same with other furniture, equipment, tools, appliances, machinery, fixtures, or appurtenances not necessarily of the same character, but of at least equal value to the Borrower and costing not less than the original acquisition cost of the property sold or otherwise disposed of, which shall forthwith become, without further action, subject to the lien of this Mortgage.

(c) If the Mortgaged Property or any part thereof is damaged by fire or any other cause, the Borrower will give immediate written notice of same to Lender.

(d) The Lender is hereby authorized to enter upon and to inspect the Mortgaged Property at any reasonable time during normal business hours during the term of this Mortgage.

(e) The Borrower will promptly comply with all present and future laws, ordinances, rules and regulations of any governmental authority affecting the Mortgaged Property or any part thereof.

(f) If all or any part of the Mortgaged Property shall be damaged by fire or other casualty, the Borrower will promptly restore the Mortgaged Property to the equivalent of its original condition regardless of whether or not there shall be any insurance proceeds therefor. If any part of the Mortgaged Property shall be physically damaged through condemnation, the Borrower will promptly restore, repair or alter the remaining property in a manner satisfactory to the Lender.

(g) In the event that Borrower intends to undertake construction activities of any kind on or about the Mortgaged Property, Borrower agrees (i) to obtain Lender's prior written approval of the plans and specifications therefor, which shall not be unreasonably withheld or delayed, (ii) to undertake all such activities in good and workmanlike manner, with minimum interference with and disruption to owners and residents of other portions of the project of which the Land forms a part, (iii) to promptly repair and restore any improvements at said project which are damaged or destroyed as a result of such activities, (iv) not to suffer or permit the filing of any lien or claim or lien on any portion of the Land as a result thereof, (v) to perform all such activities in strict compliance with all necessary government permits and requirements, and (vi) to indemnify and save and hold Lender harmless from and against any and all damages, claims, losses or expenses (including reasonable attorneys' fees) asserted against or incurred by Lender as a result of such activities.

1.08    Further Assurances.    Borrower will make, execute and deliver to the Lender and, where appropriate, shall cause to be recorded and/or filed and from time to time thereafter to be re-recorded and/or refiled at such time and in such offices and places as shall be deemed desirable by the lender, any and all such further mortgages, instruments of further assurance, certificates and other documents as may, in the reasonable opinion of the Lender, be necessary or desirable in order to effectuate, complete, perfect, or to continue and preserve:

(a) The obligations of the Borrower under this Mortgage and Note secured hereby, and

(b)    The lien of this Mortgage as a valid lien upon all of the Mortgaged Property, whether now owned or hereafter acquired by the Borrower.

Upon any failure by the Borrower to do so, the Lender may make, execute, record, file, re-record and/or re-file any and all such mortgages, instruments, certificates and documents for and in the name of the Borrower, and the Borrower hereby irrevocably appoints the Lender the agent and attorney-in-fact of the Borrower, coupled with an interest, to do so.

1.09    After Acquired Property. '  The lien of this Mortgage will automatically attach, without further act, to all after acquired property attached to or used in the operation of the Mortgaged Property or any part thereof, including but not limited to the fee title to the Land.

1.10    Leases Affecting Mortgaged Property.    The Borrower will comply with and observe its obligations as landlord under all leases affecting the Mortgaged Property or any part thereof.  Upon default Borrower will furnish Lender with executed copies of all leases hereafter created on the Mortgaged Property and all amendments thereto.  Lender specifically reserves the right to approve in advance all leases and amendments thereto which are hereafter entered into by Borrower and in which the rental term exceeds twelve (12) calendar months. The Lender also specifically reserves the right at any time following a default by Borrower under the Loan, to approve in advance all prospective lessees as to financial capabilities, which approval will not unreasonably be withheld. Unless otherwise herein specifically provided, all leases shall be inferior and subordinate in all respects to the lien of this Mortgage, and the terms of each lease shall so provide. If Borrower is in default, Borrower will not, without the express written consent of the Lender, modify, surrender, or terminate, either orally or in writing, any lease hereafter created upon the Mortgaged Property, nor will the Borrower permit an assignment of sub-lease without the express written consent of the Lender. Except for the collection of a security deposit and last month's rent upon execution of a lease, Borrower will not otherwise accept payment of rent more than one (1) month in advance without the express written consent of the Lender. If requested by the Lender, the Borrower will specifically assign to the Lender as additional security any and all such leases hereafter created, including, without limitation, all rents, royalties, issues and profits of the Mortgaged Property from time to time accruing, the parties hereto acknowledging that this Mortgage constitutes a general assignment of any and all such future leases.

1.11    Expenses.    Borrower shall pay or reimburse Lender for all reasonable costs, charges and expenses, including reasonable attorney's fees, including appellate proceedings, and disbursements, and costs of abstracts of title

incurred or paid by Lender in any action, proceeding or dispute in which Lender is made a party or appears as a party plaintiff or party defendant because of the failure or alleged failure of the Borrower promptly and fully to perform and comply with all conditions and covenants of this Mortgage and the Note secured hereby, including but not limited to, the foreclosure of this Mortgage, condemnation of all or part of the Mortgaged Property, or any action to protect the security thereof. All costs, charges and expenses so incurred by Lender shall become due and payable whether or not there be notice, demand, attempt to collect or suit pending. The amounts so paid or incurred by Lender, together with interest thereon at the Default Rate as hereinafter defined from the date incurred until paid by Borrower, shall be secured by the Lien of this Mortgage.

1.12    Lender's Performance of Defaults.   If the Borrower shall Default in the payment of any tax assessment, encumbrance or other imposition, in its obligation to furnish insurance hereunder or in the performance or observance of any other covenant, condition or term in this Mortgage, the Lender, may at its option, without waiving or affecting its option to foreclose or any other rights hereunder, perform or observe the same, and all payments made or costs or expenses incurred by the Lender in connection therewith shall be secured hereby and shall be immediately repaid by the Borrower to the Lender, with interest thereon at the Default Rate as hereinafter defined. Nothing contained herein shall be construed as requiring the Lender to advance or expend monies for any purposes mentioned in this Paragraph. The Lender is hereby empowered to enter and to authorize others to enter upon the Mortgage Property or any part thereof for the purpose of performing or observing any such Defaulted covenant, condition or terms, without thereby becoming liable to the Borrower or any person in possession holding under the Borrower.

1.13 Books and Records.   The Borrower shall keep and maintain at all times full, true and accurate books of accounts and records, in accordance with generally accepted accounting principles, adequate to reflect correctly the results of the operation of the Mortgaged Property.

1.14    Estoppel Affidavits.   The Borrower and Lender, within ten (10) days after written request from the other, shall furnish a written statement, duly acknowledged, setting forth the unpaid principal of, an interest on, the Note and whether or not any offsets or defenses exist against such principal and interest. Borrower shall pay to Lender a reasonable fee for any statement regarding the obligations secured hereby requested to be furnished by Lender in an amount determined by Lender.

## ARTICLE TWO

## DEFAULTS

2.01    Event of Default.   The term "Default", wherever used in the Mortgage, shall mean any one or more of the following events:

(a)    Failure by Borrower to pay any installments of principal or interest due under the Note, or any deposits for taxes and assessments or insurance premiums due hereunder, or any other sum to be paid by Borrower hereunder or under any other instrument securing the Note or any other instrument collateral to the Note or executed in connection with this loan transaction, that is not cured within any applicable cure or grace period.

(b)    Failure by Borrower to duly keep, perform and observe any other covenant, condition or agreement in the Note, this Mortgage, any other instrument securing the Note or any other instrument collateral to the Note or executed in connection with this loan transaction, that is not cured within any applicable cure or grace period as set forth in the Loan Agreement or other applicable document.

(c)    If Borrower or any endorser or guarantor of the Note shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, wage earner's plan, assignment for the benefit of creditors, receivership, dissolution or similar relief under any present or future Federal Bankruptcy Act or any other present or future applicable federal, state or other statute or law, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of Borrower or all or any part of the properties of Borrower or of any guarantor or endorser of the Note; or if within one hundred twenty (120) days after commencement of any proceeding against Borrower or any guarantor or endorser of the Note, seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, debtor relief or similar relief under any present or future Federal Bankruptcy Act or any other present or future federal, state or other statute or law, such proceeding shall not have been dismissed, or stayed on appeal; or if, within one hundred twenty (120)  days after the appointment, without the consent or acquiescence of Borrower or of any endorser or guarantor of the Note, of any trustee, receiver, or

Page **8** of **20**

liquidator of Borrower or any endorser or guarantor of the Note, or of all or any portion of the Mortgaged Property, such appointment shall not have been vacated or stayed, on appeal or otherwise; or if within one hundred twenty (120)   days after the expiration of any such stay such appointment shall not have been vacated.

(d)   The entry by any court of last resort of a decision that an undertaking by the Borrower as herein provided to pay taxes, assessments, levies, liabilities, obligations and encumbrances is legally inoperative or cannot be enforced, or in the event of the passage of any law changing in any way or respect the laws now in force for the taxation of mortgages or debts secured thereby (which are in the nature of documentary stamps or intangible taxes) for any purpose or the manner of collection of any such taxes, so as to affect adversely this Mortgage or the debt secured hereby.

(e)   If a default shall have occurred with respect to any other mortgage encumbering the Mortgaged Property, or if foreclosure or other proceedings to enforce a lien should be instituted with respect to any lien of any kind upon the Mortgaged Property.

(f)   Any breach of any warranty or material untruth of any representation of Borrower contained in the Note, this Mortgage or any other instrument securing the Note or any other instrument executed in connection with this loan.

2.02    Acceleration of Maturity.    If a Default shall have occurred and be continuing, the Lender may, upon providing Borrower with ten (10) day written notice to cure default, declare the entire principal amount of the Note then unpaid and the interest accrued thereon to be due and payable immediately, and upon such declaration such principal and interest shall forthwith become and be due and payable, together with any prepayment fees that may be due and payable in full as fully and completely as if the said aggregate sum of said indebtedness was originally stipulated to be paid in full on such date, anything in the Note or this Mortgage to the contrary notwithstanding.

2.03    Lender's Right to Enter and Take Possession, Operate and Apply Income.

(a)   If a Default shall have occurred and be continuing the Borrower, upon demand of the Lender, shall forthwith surrender to the Lender the actual possession of the Mortgaged Property, and to the extent permitted by law the Lender itself, or such officers or agents as it may appoint, may enter and take possession of all the Mortgaged Property, and may exclude the Borrower and its agents and employees wholly therefrom, and may have joint access with the Borrower to the books, papers and accounts of the Borrower.

(b)   If the Borrower shall, for any reason, fail to surrender or deliver any such Mortgaged Property or any part thereof after such demand by the Lender, the Lender may obtain a judgment or decree conferring on the Lender the right to immediate possession or requiring the Borrower to deliver immediate possession of all or part of such Mortgaged Property to the Lender, to the entry of which judgment or decree the Borrower hereby specifically consents.

(c)   The Borrower will pay to the Lender, upon demand, all reasonable expenses of obtaining such judgment or decree and reasonable compensation to the Lender, its attorneys and agents, and all such expenses and compensation shall, until paid, be secured by the lien of this Mortgage.

(d)   Upon every such entering upon or taking of possession, the Lender may hold, store, use, operate, manage and control the Mortgaged Property and conduct the business thereof, and, from time to time

(i)   make all necessary (as determined by Lender in its sole and absolute discretion) maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon, and purchase or otherwise acquire additional fixtures, personalty and other property;

(ii)   insure or keep the Mortgaged Property insured and exercise all the rights and powers of the Borrower in its name or otherwise, with respect to the same;

(iii)   manage and operate the Mortgaged Property and exercise all the rights and powers of the Borrower in its name or otherwise, with respect to the same;

(iv)   enter into any and all agreements with respect to the exercise by others of any of the powers herein granted the Lender,

all as the lender from time may determine to be to its best advantage, and the Lender may collect and receive all the income, revenues, rents, issues and profits of the same, including those past due as well as those accruing thereafter, and after deducting:

(aa)   all expenses of taking, holding, managing, and operating the Mortgaged Property (including compensation for the services of all persons employed for such purposes);

(bb)   the cost of all such maintenance, repairs, renewals, replacements, additions, betterments, improvements and purchases and acquisitions;

(cc)   the cost of such insurance;

(dd)   such taxes, assessments and other charges prior to the lien of this Mortgage as the Lender may determine to pay;

(ee)   other proper charges upon the Mortgaged Property or any part thereof; and

(ff)   the reasonable compensation expenses, and disbursements of the attorneys and agents of the Lender,

shall apply the remainder of the monies so received by the Lender, first to the payment of accrued interest; second to the payment of any required tax deposit, insurance deposit or expenses required by Lender; and third toward the outstanding principal balance on the Note.

2.04    Lender's Power of Enforcement.   If a Default shall have occurred and be continuing the Lender may, either with or without entry or taking possession as hereinabove provided or otherwise, proceed by suit or suits at law or in equity or by any other appropriate proceeding or remedy (a) to enforce payment of the Note or the performance of any term hereof or any other right, (b) to foreclose this Mortgage and to sell, as an entirety or in separate lots or parcels, the Mortgaged Property, under the judgment or decree of a court or courts of competent jurisdiction, and (c) to pursue any other remedy available to it, all as the Lender shall deem most effectual for such purposes. The Lender shall take such action either by such proceedings or by the exercise of its powers with respect to entry or taking possession, as the Lender may determine.

2.05    Leases.   The Lender, at the Lender's option, is authorized to foreclose this Mortgage subject to the rights of any tenants of the Mortgaged Property, and the failure to make any such tenants parties defendant to any such foreclosure proceedings and to foreclose their rights will not be, nor be asserted by the Borrower as, a defense to any actions or proceedings instituted by the Lender to collect the sums secured hereby.

2.06    Principal and Interest Become due on Foreclosure.   Upon commencement of suit or foreclosure of this Mortgage, the unpaid principal of the Note, if not previously declared due, and the interest accrued thereon, shall at once become and be immediately due and payable.

2.07    Purchase by Lender.   Upon any such foreclosure sale, pursuant to judicial proceedings, the Lender may bid for and purchase the Mortgaged Property and, upon compliance with the terms of the sale, may hold, retain and possess and dispose of such property in its own absolute right, without further accountability.

2.08    Application of Indebtedness Toward Purchase Price.   Upon any such foreclosure sale, pursuant to judicial proceedings, the Lender may, if permitted by law, after allowing for the proportion of the total purchase price required to be paid in cash for the costs and expenses of the sale, compensation and other charges, in paying the purchase price, apply to the purchase price any portion of or all sums due to the Lender under the Note and this Mortgage, in lieu of cash, to the amount which shall, upon distribution of the net proceeds of such sale, be payable thereon.

2.09    Waiver of Appraisement, Valuation, Stay, Extension and Redemption Laws.   The Borrower agrees to the full extent permitted by law that in case of a Default on its part hereunder, neither the Borrower nor anyone claiming through or under the Borrower shall or will set up, claim or seek to take advantage of any appraisement, valuation, stay, extension or

redemption laws now or hereafter in force, in order to prevent or hinder the enforcement or foreclosure of this Mortgage, or the absolute sale of the property hereby conveyed, to the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereat; and the Borrower, for itself and all who may at any time claim through or under it, hereby waives, to the full extent that it may lawfully do so, the benefit of all such laws and any and all right to have the assets comprised in the security intended to be created hereby marshaled upon any foreclosure of the lien hereof and agrees that the Lender or any court having jurisdiction to foreclose such lien may sell the Mortgaged Property as an entirety.

2.10    Receiver.    If a Default shall occur and be continuing, then upon the filing of a bill in equity or other commencement of judicial proceedings to enforce the rights of the Lender, the Lender to the extent permitted by law and without regard to the value or occupancy of the security shall be entitled as a matter of right to the appointment of a receiver to enter upon and take possession of the Mortgaged Property. The receiver shall collect all rents, revenues, issues, income, products and profits thereof pending such proceedings and apply the same as the court may direct. The receiver shall have all rights and powers permitted under the laws of Florida and such other powers as the court making such appointment shall confer. The reasonable expenses, including receiver's fees, counsel fees, costs and agent's compensation, incurred pursuant to the powers herein contained shall be secured by this Mortgage. The right to enter, take possession of, manage and operate the Mortgaged Property, to collect the rents, issues and profits thereof, whether by a receiver or otherwise, shall be cumulative to any other right or remedy hereunder or afforded by law, and may be exercised concurrently therewith or independently thereof. Lender shall be liable to account only for such rents, issues and profits as are actually received by Lender, whether received pursuant to this Paragraph 2.10 or Paragraph 2.03 above. Notwithstanding the appointment of any receiver, trustee or other custodian, the Lender shall be entitled as pledgee to the possession and control of any cash or other instruments at the time held by, or payable or deliverable under the terms of this Mortgage to the Lender.

2.11    Suits to Protect the Mortgaged Property.    The Lender shall have power (a) to institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Mortgaged Property by any acts which may be unlawful or by any violation of the Mortgage, (b) to preserve or protect its interest in the Mortgaged Property and in the income, revenues, rents and profits arising therefrom, and (c) to restrain the enforcement of or compliance with any legislation or other governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would impair the security hereunder or be prejudicial to the interest of the Lender.

2.12    Proofs of Claim.    In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceedings affecting the Borrower, its creditors or its property, the Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of the Lender allowed in such proceedings for the entire amount due and payable by the Borrower under this Mortgage at the date of the institution of such proceedings and for any additional amount which may become due and payable by the Borrower hereunder after such date.

2.13    Acceleration; Application of Monies by Lender.

(a) If Default shall be made in the payment of any amount due under the Mortgage or the Note secured hereby, then without demand, the Borrower will pay to the Lender the entire amount due and payable under the Note. If borrower shall fail to pay the same forthwith, the Lender shall be entitled to sue for and to recover judgment against the Mortgaged Property for the whole amount so due and unpaid together with costs, which shall include the reasonable compensation, expenses and disbursements of the Lender's agents and attorneys either before, after or during the pendency of any proceedings for the enforcement of this Mortgage including appellate proceedings. The right of the Lender to recover such judgment shall not be precluded by any taking, possession or foreclosure sale hereunder, or by the exercise of any other right, power or remedy for the enforcement of the terms of this Mortgage, or the foreclosure of the lien hereof.

(b)  Any monies thus collected by the Lender or received by the Lender under this Paragraph 2.13 shall be applied as follows:

First to the payment of the reasonable attorney's fees and expenses incurred by Lender, its agents and attorneys, including but not limited to taxes paid, insurance premiums paid, receivers fees, etc.

Second, toward payment of the amounts due and unpaid upon the Note.

2.14    <u>Delay or Omission No waiver.</u>    No delay or omission of the Lender or of any holder of the Note to exercise any right, power or remedy accruing upon any Default shall exhaust or impair any such right, power or remedy or shall be construed to be a waiver of any such Default, or acquiescence therein; and every right, power and remedy given by this Mortgage to the Lender may be exercised from time to time and as often as may be deemed expedient by the Lender.

2.15    <u>No Waiver of One Default to Affect Another.</u>    No waiver of any Default hereunder shall extend to or shall affect any subsequent or any other then existing Default or shall impair any rights, powers or remedies consequent thereon. By way of example, and not by way of limitation, if the Lender (a) grants forbearance or an extension of time for the payment of any sums secured hereby; (b) takes other or additional security for the payment thereof; (c) waives or does not exercise any right granted herein or in the Note; (d) releases any part of the Mortgaged Property from the Note or Mortgage; (e) consents to the filing of any map, plat or replat thereof; (f) consents to the granting of any easement thereof, or (g) makes or consents to any agreement subordinating the lien hereof, any such act or omission shall not release, discharge, modify, change or affect the original liability under the Note, Mortgage or otherwise of the Borrower or any subsequent purchaser of the Mortgaged Property or any part thereof, or any maker, co-signer, endorser, surety or guarantor; nor shall any such act or omission preclude the Lender from exercising any right, power or privilege herein granted or intended to be granted in the event of any other Default then made or of any subsequent Default nor, except as otherwise expressly provided in an instrument or instruments executed by the Lender, shall the lien of this Mortgage be altered thereby. In the event of the sale or transfer by operation of law or otherwise of all or any part of the Mortgaged Property, the Lender, without notice to any person or corporation, is hereby authorized and empowered to deal with any such vendee or transferee with reference to the Mortgaged Property or the indebtedness secured hereby, or with reference to any of the terms or conditions hereof, as fully and to the same extent as it might deal with the original parties hereto and without in any way releasing or discharging any of the liabilities or undertakings hereunder.

2.16    <u>Discontinuance of Proceedings -- Position of Parties Restored.</u>    In case the Lender shall have proceeded to enforce any right or remedy under this Mortgage by foreclosure, entry or otherwise, and such proceedings shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Lender, then and in every such case, the Borrower and the Lender shall be restored to their former positions and rights hereunder, and all rights, powers and remedies of the Lender shall continue as if no such proceeding has been taken.

2.17    <u>Remedies Cumulative.</u>    No right, power or remedy conferred upon or reserved to the Lender by this Mortgage is intended to be exclusive of any other right, power or remedy, but each and every such right, power and remedy shall be cumulative and concurrent and shall be in addition to any other right, power and remedy given hereunder or now or hereafter existing at law or in equity or by statute.

## ARTICLE THREE

### MISCELLANEOUS PROVISIONS

3.01    <u>Successors, Assigns Included in Parties.</u>    Whenever in this Mortgage one of the parties hereto is named or referred to, the successors and assigns of such party shall be included and all covenants and agreements contained in this Mortgage by or on behalf of the Borrower or by or on behalf of Lender, shall bind and inure to the benefit of its respective successors and assigns subject to the provisions of Paragraph 3.07, whether so expressed or not. Whenever the singular or plural number, masculine or feminine or neuter gender is used herein, it shall equally include the other.

3.02    <u>Notice.</u>

(a) Borrower. Any notice, demand or other instrument authorized by this Mortgage to be served on or given to the borrower may be served on or given to the Borrower, at:

### THE BORROWER'S ADDRESS AS INDICATED ON PAGE ONE HEREOF

or at such other address as may have been furnished in writing to the Lender by the Borrower.

(b)   Lender. Any notice, demand or other instrument to be served on or given to the Lender may be served on or given to the Lender at its offices located at:

**THE LENDER'S ADDRESS AS INDICATED ON PAGE ONE HEREOF**

or at such other address as may have been furnished in writing to the Borrower by the Lender.

(c) Delivery of Notice. All notices shall be in writing and shall be delivered by certified mail, return receipt requested, or be delivered via overnight mail service. All notices shall be deemed made when delivery is first attempted at the address or addresses required hereunder.

(d) Nothing contained in this paragraph shall be construed as obligating either party to provide any notice to the other.

3.03      Headings.   The headings of the articles, sections, paragraphs and subdivisions of this Mortgage are for convenience of reference only, and are not to be considered a part hereof, and shall not limit or otherwise affect any of the terms hereof.

3.04      Invalid Provisions to Affect No Others.    In case any one or more of the covenants, agreements, terms or provisions contained in this Mortgage or in the Note or in any instruments collateral to the Note or executed in connection with this loan transaction shall be invalid, illegal or unenforceable in any respect, the validity of the remaining covenants, agreements, terms or provisions contained herein and in the Note shall be in no way affected, prejudiced or disturbed thereby.

3.05      Modifications.    It is understood and agreed that the Lender may at any time, without notice to any person, grant to the Borrower any modification of any kind or nature whatsoever, or allow any change or changes, substitution or substitutions of any of the property described in this Mortgage or any other collateral which may be held by the Lender without in any manner affecting the liability of the Borrower, any endorsers or guarantors of the indebtedness hereby secured or any other person for the payment of said indebtedness, together with any interest and any other sums which may be due and payable to the Lender, and also without in any manner affecting or impairing the lien or this Mortgage upon the remainder of the Mortgaged Property and other collateral which is not changed or substituted; and it is also understood and agreed that the Lender may at any time, without notice to any person, release any portion of the property described in this Mortgage or any other collateral, or any portion of any other collateral which may be held as security for the payment of the indebtedness hereby secured, either with or without any consideration of such release or releases, without in any manner affecting the liability of the Borrower, all endorsers or guarantors, if any, and all other person who are or shall be liable for the payment of said indebtedness, and without affecting disturbing or impairing in any manner whatsoever the validity and priority of the lien of this Mortgage for the full amount of the indebtedness remaining unpaid, together with all interest and advances which shall become payable, upon the entire remainder of the Mortgaged Property which is unreleased, and without in any manner affecting or impairing to any extent whatsoever any and all other collateral security which may be held by the Lender. It is distinctly understood and agreed by the Borrower and the Lender that any release or releases may be made by the Lender without the consent or approval of any other person or persons whomsoever.

3.06      Uniform Commercial Code.    The parties agree that this Mortgage is a security agreement under the Uniform Commercial Code for the purpose of creating a lien on the personal property and fixtures described herein.

3.07      No Transfer or Further Encumbrance.    Borrower understands that in making this loan, Lender is relying to a material extent upon the business expertise of Borrower, and upon the continuing interest which Borrower will have in the Mortgaged Property. Accordingly, except as hereinafter expressly provided, in the event that (i) Borrower, directly or indirectly, voluntarily or involuntarily, sells, enters into a contract of sale, assigns, transfers, disposes of, alienates or further encumbers, all of any portion of or any interest in the Mortgaged Property, or suffers to exist any other lien against all or any portion of or any interest in the Mortgaged Property, or leases the Mortgaged Property or any part thereof pursuant to any lease which contains an option to purchase, or changes the character or use of the Mortgaged Property, or drills or extracts, or enters into a lease for the drilling for or extraction of oil, gas or other hydrocarbon substances or any mineral of any kind on the Mortgaged Property, or (ii) any stock or general partner's interest in the Borrower is, directly or indirectly, voluntarily or involuntarily, sold, assigned, transferred, disposed of, pledged, diluted or encumbered, or (iii) Borrower or any of its general partners or stockholders agrees to do any of the foregoing acts, then or at any time thereafter, Lender, at its option, may declare the entire loan immediately due and payable.

The option of Lender under this Paragraph 3.07 to declare a Default for any of the above-mentioned acts may be exercised at any time after the occurrence of any such event, and the acceptance of one or more installments from any person thereafter shall not constitute a waiver of Lender's option.

3.08    _Future Advances._    Pursuant to Florida Statutes Sec. 697.04, this Mortgage is given to secure not only the existing indebtedness of Borrower to Lender evidenced by the Note secured hereby, but also such future advances as are made within twenty (20) years from date hereof, plus interest thereon, and other disbursements made pursuant hereto or for the protection of the security for the indebtedness secured hereby, with interest on such disbursements, which advances shall be secured hereby to the same extent as if such future advance were made this date. The total amount of indebtedness secured hereby may increase or decrease from time to time. The provisions of this paragraph shall not be construed to imply any obligation on Lender to make any future advances, it being the intention of the parties that any future advances shall be solely at the discretion and option of the Lender. Any reference to "Note" in this Mortgage shall be construed to reference any future advances made pursuant to this paragraph. In no event shall the total of the original indebtedness together with advances exceed 500% of the original loan amount.

3.09    _Leasing Commission._    Borrower covenants that every agreement to pay leasing commissions with respect to the leasing of space in the Mortgaged Property, or any part thereof, are and shall be subject, subordinate and inferior to the right of Lender, so that in the event Lender acquires title to the Mortgaged Property either at a foreclosure sale or by other means, Lender will be exonerated and discharged from all liabilities for the payment of any such commissions or compensations.

3.10    _Time is of the Essence._    It is specifically agrees that time is of the essence of this Mortgage and that no waiver of any obligation hereunder or of the obligation secured hereby shall at any time thereafter be held to be a waiver of the terms hereof or of the instrument secured hereby.

3.11    _Attorney's Fees and Expenses._    Wherever provision is made herein for payment for reasonable attorney's or counsel's fees or expenses incurred by the Lender, said provision shall include, but not be limited to, reasonable attorney's or counsel's fees or expenses incurred in any and all judicial, bankruptcy, reorganization, administrative, or other proceedings, including appellate proceedings, whether such proceeding arises before or after entry of a final judgment. In any court action, reasonable attorney fees shall be determined by the Court based on affidavits submitted by the parties and no expert testimony shall be permitted unless specifically ordered by the Court. As an alternative, at the option of the party seeking the award of a reasonable attorney fee, provided that the attorney fee sought from the Court does not exceed ten percent (10%) of the principal balance on the note secured hereby, it shall not be necessary for the Court to determine what would constitute a reasonable and just attorney fee and the parties hereby agree that such a fee is reasonable and just in accordance with section 687.06, Florida Statutes.

3.12.    _Annual Review._ Lender may conduct an annual review of Borrower's Loan. Borrower agrees that Lender may obtain credit reports on Borrower at any time, at Lender's sole option and expense, for any reason including, but not limited to determining whether there has been an adverse change in Borrower's financial condition.    Borrower agrees to maintain a Debt-Service-Coverage Ratio (DSC ratio) of 1.2 or better on the mortgaged property during the entire life of the loan. The Net Operating Income and Debt Service Coverage Ratio are to be calculated according to the Lender's usual underwriting methods and standards. Should the DSC ratio fail to meet the 1.2 requirement, then the Borrower shall be in default and the whole of the unpaid principal hereof, together with accrued interest and outstanding default interest, and in addition, any minimum interest amount, shall, at the election of lender and without necessity of further notice of such election, become immediately due and payable. Lender's election may be exercised at any time after such event, and the acceptance of one or more payments hereon from any person thereafter shall not constitute a waiver of lender's election, or of its option to make such election.    Lender may at Lender's option request a pay down of the principal in order to meet the ratio.

ARTICLE FOUR

ADDITIONAL PROVISIONS

4.01    _Provisions Relating to Hazardous Materials._

(a)    After due inquiry and investigation, Borrower represents and warrants that (i) the Mortgaged

Page **14** of **20**

Property is not in violation of any Hazardous Materials Law as to conditions on, under or about the Mortgaged Property, including, but not limited to, soil and groundwater condition; (ii) neither Borrower nor, to the best of Borrower's knowledge, any other person has used, generated, manufactured, stored or disposed of, on, under or about the Mortgaged Property or transported to or from the Mortgaged Property any Hazardous Materials in violation of any Hazardous Materials Laws; (iii) there are no underground storage tanks under the Mortgaged Property; and (iv) the Mortgaged Property and its current use comply with all Hazardous Materials Law.

(b)    Borrower covenants and agrees that Borrower shall not cause or permit the presence, use, generation, manufacture, release, discharge, storage or disposal of any Hazardous Materials on, under in or about the Mortgaged Property, or the transportation of any Hazardous Materials to or from the Mortgaged Property in violation of any Hazardous Materials Laws. Borrower shall immediately notify Lender in writing of: (i) any enforcement, cleanup, removal or other governmental or regulatory action instituted, completed or threatened by any third party against Borrower or the Mortgaged Property relating to damage, contribution, cost recovery, compensation, loss or injury resulting from any Hazardous Materials; and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Mortgaged Property that could result in the contamination of the Mortgaged Property or groundwater under the Mortgaged Property by Hazardous Materials or cause all or any portion of the Mortgaged Property to be subject to any restrictions on the ownership, occupancy, transferability or use of the Mortgaged Property under Hazardous Materials Laws.

(c)    Borrower shall indemnify, defend and hold Lender, its employees, agents, officers and directors, harmless from and against any claim, action, suite, proceeding, loss, cost, damage, liability, deficiency, fine, penalty, punitive damage or expense (including, without limitation, attorney's and consultant fees), directly or indirectly resulting from arising out of, or based upon (i) the presence, release, use manufacture, generation, discharge, storage or disposal of any Hazardous Materials on, under, in or about, or the transportation of Hazardous Materials in violation of any Hazardous Materials Laws to or from the Mortgaged Property. This indemnity shall include, without limitation, any damage, liability, fine, penalty, punitive damage, cost or expense arising from or out of any claim, action, suit or proceeding for personal injury (including sickness, disease or death), tangible or intangible property damage, compensation for lost wages, business income, profits or other economic loss, damage to the natural resources or the environment, nuisance, pollution, contamination, leak, spill, release or other adverse effect on the environment, and the cost of any required or necessary repair, cleanup, treatment or detoxification of the Mortgaged Property, and the preparation and implementation of any closure, disposal, remedial or other required actions in connection with the Mortgaged Property.

(d)    At any time during the terms of this Mortgage, Lender shall have the right, on twenty-four (24) hours prior written notice to Borrower, to enter the Mortgaged Property and to conduct such tests and investigations as Lender reasonably deems necessary to determine whether any Hazardous Materials in violation of any Hazardous Materials Laws are present in, under, on or about the Mortgaged Property. Such tests and investigations shall include, without limitation, underground borings and groundwater analyses on the Mortgaged Property. Lender shall indemnify, defend and hold Borrower harmless from any and all loss, cost, damage, injury or expense arising out of or relating to claims resulting the exercise of Lender's right of entry under this Paragraph.

(e)    "Hazardous Materials Law", for purposes of this Paragraph 4.01 means any federal, state, or local law, ordinance or regulation or any court judgment applicable to Borrower or to the Mortgaged Property relating to industrial hygiene or to environmental conditions including, but not limited to, those relating to the release, emission or discharge of Hazardous Materials, those in connection with the construction, fuel supply, power generation and transmission, waste disposal or any other operations or processes relating to the Mortgage Property. "Hazardous Materials Law" shall include, but not be limited to, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Hazardous Materials Transportation Act, the Resource Conservation and Recovery Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, Chapter 376 Florida Statutes.

(f)    "Hazardous Materials", for purposes of this Paragraph 4.01, includes flammable explosives, radioactive materials, polychlorinated biphenyls, asbestos in any form which is or could become friable, hazardous waste, toxic substances or other related materials whether in the form of a chemical, element, compound, solution, mixture or otherwise, including, but not limited to, those materials defined as "hazardous substances", "hazardous materials", "toxic substances", "air pollutants", "toxic pollutants", "hazard wastes", "extremely hazardous waste" or "restricted hazardous waste" by Hazardous Material Law.

4.02. <u>Waiver of right to Jury Trial.</u> Each borrower, guarantor, mortgagor and endorser hereby knowingly, voluntarily and intentionally waives the right either may have to a trial by jury in respect of any litigation based hereon or arising out of, under or in connection with this Mortgage, the Promissory Note secured hereby or any of the security documents executed in connection therewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party. This provision is a material inducement to the making of the loan to Borrower by Lender and Lender's successors and assigns, and to the advance or other extension of credit to the Borrower. Borrower, guarantor, mortgagor and endorser represent and warrant that the waivers contained in this paragraph have been freely and voluntarily made after reviewing same with counsel of their choosing. This provision shall be binding upon any party who, at any time hereafter, assumes the obligation to pay any monies secured hereby.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the undersigned has (have) executed this instrument the day and year first above written.

**THIS IS A BALLOON MORTGAGE AND THE FINAL PRINCIPAL PAYMENT OR THE PRINCIPAL BALANCE DUE UPON MATURITY IS $8,362,569.01 TOGETHER WITH ACCRUED INTEREST, IF ANY, AND ALL ADVANCEMENTS MADE BY THE MORTGAGEE UNDER THE TERMS OF THIS MORTGAGE.**

Signed, sealed and delivered
in the presence of:

MY FL 3821 LLC, a Florida limited liability company

BY: MY FL MANAGEMENT, LLC,
a Florida limited liability company, as Manager

(witness #1 sign) _____
(witness #1 print) _David J Wallace_

BY: _____ (SEAL)
YURY GNESIN, as Manager

(witness #2 sign) _____
(witness #2 print) _Lorraine Rhein_

BY: STAR MANAGEMENT, LLC
a Delaware limited liability company, as manager

(witness #1 sign) _____
(witness #1 print) _David J Wallace_

BY: _____ (SEAL)
ELENA TEMNIKOVA, as Manager

(witness #2 print) _____
(witness #2 print) _Lorraine Rhein_

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, personally appeared YURY GNESIN, as Manager of MY FL MANAGEMENT, LLC, a Florida limited liability company as Manager of MY FL 3821 LLC, a Florida limited liability company, who is personally known to me, or who produced the following identification: _D/L_ and who executed the foregoing document, and who acknowledged before me that same was executed under oath for the uses and purposes in said instrument set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this _31_ day of August, 2017.

My commission expires:

DAVID J. WALLACE
MY COMMISSION # FF 950884
EXPIRES: March 13, 2020
Bonded Thru Budget Notary Services

_____
Notary Public

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, personally appeared ELENA TEMNIKOVA, as Manager of STAR MANAGEMENT, LLC, a Delaware limited liability company, as Manager of MY FL MANAGEMENT, LLC, a Florida limited liability company as Manager of MY FL 3821 LLC, a Florida limited liability company, who is personally known to me, or who produced the following identification: _D L_ and who executed the foregoing document, and who acknowledged before me that same was executed under oath for the uses and purposes in said instrument set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this _5_ day of September, 2017.

My commission expires:

DAVID J. WALLACE
MY COMMISSION # FF 950884
EXPIRES: March 13, 2020
Bonded Thru Budget Notary Services

Page 17 of 20

_____
Notary Public

Signed, sealed and delivered
in the presence of:

MY FL 3811 LLC, a Florida limited liability company

(witness #1 sign)

(witness #1 print) Darl Jaaba

BY: MY FL MANAGEMENT, LLC,
a Florida limited liability company, as Manager

BY: _____ (SEAL)
YURY GNESIN, as Manager

(witness #2 sign)

(witness #2 print) Lorann Rius

BY: STAR MANAGEMENT, LLC
a Delaware limited liability company, as manager

(witness #1 sign)

(witness #1 print) David Jaaba

BY: _____ (SEAL)
ELENA TEMNIKOVA, as Manager

(witness #2 print)

(witness #2 print) Lorann Rius

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, personally appeared YURY GNESIN, as Manager of MY FL MANAGEMENT, LLC, a Florida limited liability company as Manager of MY FL 3811 LLC, a Florida limited liability company, who is personally known to me, or who produced the following identification: _____ DL _____ and who executed the foregoing document, and who acknowledged before me that same was executed under oath for the uses and purposes in said instrument set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 3 day of August, 2017.

My commission expires:

DAVID J. WALLACE
MY COMMISSION # FF 950884
EXPIRES: March 13, 2020
Bonded Thru Budget Notary Services

Notary Public

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, personally appeared ELENA TEMNIKOVA, as Manager of STAR MANAGEMENT, LLC, a Delaware limited liability company, as Manager of MY FL MANAGEMENT, LLC, a Florida limited liability company as Manager of MY FL 3811 LLC, a Florida limited liability company, who is personally known to me, or who produced the following identification: _____ DL _____ and who executed the foregoing document, and who acknowledged before me that same was executed under oath for the uses and purposes in said instrument set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 5 day of September, 2017.

My commission expires:

Notary Public

DAVID J. WALLACE
MY COMMISSION # FF 950884
EXPIRES: March 13, 2020
Bonded Thru Budget Notary Services

Signed, sealed and delivered
in the presence of:

RENTAL VACATION PROPERTY LLC, a Florida limited
liability company

(witness #1 sign)

(witness #1 print) David Wallace

BY: _____ (SEAL)

YURY GNESIN, as Manager

(witness #2 sign)

(witness #2 print) Lorraine Killeen

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, personally appeared YURY GNESIN, as Manager of RENTAL VACATION
PROPERTY LLC, a Florida limited liability company, who is personally known to me, or who produced the following
identification: _____ D/L _____ and who executed the foregoing document, and
who acknowledged before me that same was executed under oath for the uses and purposes in said instrument set forth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 31 day of August, 2017.

My commission expires:

DAVID J. WALLACE
MY COMMISSION # FF 950884
EXPIRES: March 13, 2020
Bonded Thru Budget Notary Services

Notary Public

Signed, sealed and delivered
in the presence of:

MY FL MANAGEMENT, LLC,
a Florida limited liability company, as Manager

(witness #1 sign)

BY:_____(SEAL)

(witness #1 print) _David J Wallace_

YURY GNESIN, as Manager

(witness #2 sign)

(witness #2 print) _Lorrane Killen_

BY: STAR MANAGEMENT, LLC
a Delaware limited liability company, as manager

(witness #1 sign)

(witness #1 print) _David J Wallace_

BY:_____(SEAL)

ELENA TEMNIKOVA, as Manager

(witness #2 print)

(witness #2 print) _Lorrane Killen_

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, personally appeared YURY GNESIN, as Manager of MY FL MANAGEMENT, LLC, a Florida limited liability company, who is personally known to me, or who produced the following identification: _____ D/L _____ and who executed the foregoing document, and who acknowledged before me that same was executed under oath for the uses and purposes in said instrument set forth.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this _31_ day of August, 2017.

My commission expires:

DAVID J. WALLACE
MY COMMISSION # FF 950884
EXPIRES: March 13, 2020
Bonded Thru Budget Notary Services

Notary Public

STATE OF FLORIDA
COUNTY OF BROWARD

BEFORE ME, the undersigned authority, personally appeared ELENA TEMNIKOVA, as Manager of STAR MANAGEMENT, LLC, a Delaware limited liability company, as Manager of MY FL MANAGEMENT, LLC, a Florida limited liability company, who is personally known to me, or who produced the following identification: _____ D/L _____ and who executed the foregoing document, and who acknowledged before me that same was executed under oath for the uses and purposes in said instrument set forth.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this _5_ day of September, 2017.

My commission expires:

Notary Public

DAVID J. WALLACE
MY COMMISSION # FF 950884
EXPIRES: March 13, 2020
Bonded Thru Budget Notary Services

Exhibit "A"

<u>Legal Description</u>

Parcel 1:

Lot 5, Block O of BERMUDA-RIVIERA SUBDIVISION OF GALT OCEAN MILE FIRST ADDITION, according to the Plat thereof as recorded in Plat Book 40, Page 12, of the Public Records of Broward County, Florida.

Parcel 2:

Lot 6, Block O of BERMUDA-RIVIERA SUBDIVISION OF GALT OCEAN MILE FIRST ADDITION, according to the Plat thereof as recorded in Plat Book 40, Page 12, of the Public Records of Broward County, Florida.

Parcel 3:

Lot 7, Block O of BERMUDA-RIVIERA SUBDIVISION OF GALT OCEAN MILE FIRST ADDITION, according to the Plat thereof as recorded in Plat Book 40, Page 12, of the Public Records of Broward County, Florida.

Parcel 4:

Fee Simple: Lots 8, 9, 10 and 13, Block O of BERMUDA-RIVIERA SUBDIVISION OF GALT OCEAN MILE FIRST ADDITION, according to the Plat thereof as recorded in Plat Book 40, Page 12, of the Public Records of Broward County, Florida.

Easement: Easement for ingress and egress upon Lots 11 and 12, Block O of BERMUDA-RIVIERA SUBDIVISION OF GALT OCEAN MILE FIRST ADDITION, according to the Plat thereof as recorded in Plat Book 40, Page 12, as contained in Agreement for Easement/Right-of-Way recorded in Official Records Book 28295 Page 493, both of the Public Records of Broward County, Florida.

# Exhibit "C"



**THE POWER OF YES**

www.admortgage.com

## Automatic Payment Authorization Form
### *You must attach a voided check or deposit slip

☑ Yes, I would like to enroll in the free* monthly Automatic Payment Program

| Name: YURY GNESIN | Street Address: Su+255 17070 Colling Ave | City, State, Zip Code: Sunny Isles · 33160 |
|---|---|---|
| **Mortgage Loan Number:** ▆▆▆▆▆▆▆ | | |
| **Daytime Phone Number:** 9173703030 | **Evening Phone Number:** 9173703030 | |
| **Financial Institution Name:** Wells FARGO | **Financial Institution Phone Number:** | |
| **Electronic ACH Routing Number:** ▆▆▆▆▆▆ | **Account Number:** ▆▆▆▆▆ | ☒ Checking ☐ Savings |

**\*Please note that your financial institution may assess a fee for this transaction.**

Please specify the payment date most convenient for you, which must be within the applicable grace period. **If a payment date is not specified, or your loan is a daily simple interest loan, payments will be deducted on your current loan due date.**

Deduct my payment on the **1ˢᵗ day of each month.**

I would like additional funds deducted and applied toward reducing my outstanding principal balance. Please deduct an additional $0 per month.

I hereby authorize **A&D MORTGAGE LLC, including its successors and/or assigns,** to initiate transfers from my checking or savings account at the financial institution indicated above for the purpose of making my monthly mortgage payment. I authorize the amount of each transfer to include my regularly scheduled payment including principal, interest and escrow items, reimbursement of corporate advances, optional insurance as applicable and the costs of any services I request.

I understand that, in accordance with the terms of my mortgage note and/or adjustments in my escrow for taxes and insurance, my payment may change from time to time as set forth in my loan documents. You are hereby authorized to change the amount of the draft from my checking or savings account, provided that you notify me of the new payment amount at least 10 days prior to the draft date. I agree that the payment change notice provided to me under the Adjustable Rate Mortgage Provisions of the Truth-in-Lending Act and/or escrow analysis form shall constitute notice of payment change as required by the Electronic Funds Transfer Act and Federal Reserve Board Regulation E.

I HEREBY AGREE TO THE TERMS AND CONDITIONS IN THIS FORM.

Borrower's Signature _____ Date 11/21/19

Co-Borrower's Signature _____ Date _____

---

1040 S. Federal Hwy., Hollywood, FL 33020      Office: 305-760-7000, Fax: 305-760-7070, Toll Free: 1-855-ADLOANS

# Exhibit "D"



JASON B. DUBOW
DAVID J. WALLACE

OF COUNSEL
ROBERT E. DUBOW

# Dubow, Dubow & Wallace
### ATTORNEYS AT LAW

215 NORTH FEDERAL HIGHWAY
DANIA BEACH, FLORIDA 33004

TELEPHONE: 954.925.8228
FACSIMILE: 954.925.8299
WWW.DDWLAW.NET

May 13, 2020                    **VIA FEDEX**

Yury Gnesin
17875 Collins Avenue
Apartment #4203
Sunny Isles Beach, FL 33160

Elena Temnikova & Maxim Temnikov
5311 Fisher Island Drive
Miami, FL 33109

             RE: our file number S-1350-20
                 My FL 3811, LLC et al. s/b A&D Mortgage LLC

Dear Mr. Gnesin, Ms. Temnikova and Mr. Temnikov:

        Please be advised that we represent A&D MORTGAGE, LLC, the
current servicer of the mortgage loan extended by A&D MORTGAGE,
LLC to MY FL 3821, LLC, a Florida limited liability company, MY
FL 3811, LLC, a Florida limited liability company, RENTALS
VACATION PROPERTY, LLC, a Florida limited liability company and
MY FL MANAGEMENT, LLC, a Florida limited liability company
(collectively referred to as BORROWER) dated September 5, 2017,
in the original principal sum of $11,000,000.00, and which
encumbers the properties commonly known as 3821 North Ocean
Boulevard, 3811 North Ocean Boulevard, 3801 North Ocean
Boulevard, 3711 North Ocean Boulevard, and 3618 North Ocean
Boulevard, all in Ft. Lauderdale, FL 33308. Pursuant to the
Absolute Guaranty which each of you executed, you are
unconditionally responsible for the BORROWER'S noncompliance
therewith.

        Be advised that the said mortgage loan is currently in
default due to non-payment of the scheduled monthly payments,
non-payment of 2019 real estate taxes associated with the subject
property and other instances of noncompliance by BORROWER. Due to
the said defaults, the applicable interest rate on the loan has
increased to the maximum rate allowed by law, and the loan has
been accelerated, and is now due and payable in full. A lawsuit
seeking foreclosure and damages for the said default is currently
being prepared. However, I have been authorized to allow the loan
to be reinstated if all real estate taxes associated with the
subject property are paid in full ON OR BEFORE MAY 22, 2020 AND
if the following sums are remitted ON OR BEFORE May 22, 2020:

Yury Gnesin
Elena Temnikova & Maxim Temnikov
May 13, 2020
Page 2

Interest due April 1, 2020                    $218,109.00
Interest due May 1, 2020                      $218,109.00
Attorney's fees                                  1,500.00

TOTAL AMOUNT DUE
TO REINSTATE LOAN                             $437,718.00

     The amount indicated above must be RECEIVED by the
undersigned on or before the date specified, IN THE FORM OF
CASHIER'S CHECK, made payable to DUBOW, DUBOW & WALLACE TRUST
ACCOUNT OR VIA WIRE TRANSFER TO OUR TRUST ACCOUNT, INSTRUCTIONS
FOR WHICH ARE AS FOLLOWS:

BANKUNITED
14817 Oak Lane
Miami Lakes, FL 33016

Routing #: ███████████████

Credit Account #: ████████████

SWIFT CODE (for international wires): ████████████

Name of Account: ██████████████████████████████

     This offer of settlement will expire at 2 p.m. on May 22,
2020. This offer may only be accepted by performance. This offer
may be withdrawn at anytime prior to acceptance. This offer is
made solely for settlement purposes, and is not to be deemed an
admission of any kind by the offeror.

                              Yours very truly,



                              Jason B. Dubow
                              For the Firm